[Crim. No. 35432. Second Dist., Div. Five. June 10, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES ALAN McDANIELS, Defendant and Appellant.

COUNSEL

Craig B. Leeds, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders, Gary R. Hahn and John R. Gorey, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KAUS, P. J.—Defendant James A. McDaniels appeals from a conviction of first degree murder. (Pen. Code, §§ 187, 189.)

FACTS

On the afternoon of April 19, 1977, defendant, then age 16, and several of his "Cripts"[1] gang friends drove in a three-car caravan to the area of Main and Allenhurst in south central Los Angeles; their purpose was to engage one or more members of the "Fives"—a rival gang whose territory included the Main and Allenhurst intersection—in a re-

---

[1]"Cripts" is an appellation attached to a number of gang factions, i.e., the "Pay Back Cripts," "Raymond Cripts," "Nine Deuce Hoover Cripts," etc.

tributive clash of some sort. Upon their arrival, four of the youths left their vehicles and proceeded, four abreast, to corner 15-year-old Bradley Phillips next to a parked car. As one of the four pointed a gun at him, Phillips, who was kneeling with his hands in the air, protested that he was not a gang member.[2] Undaunted or unpersuaded, the gunman squeezed off five shots; the first two knocked Phillips to the ground, the third came in response to Phillips' violent kicking, and two final shots to the head, fired from the distance of about a foot, were added even as the gunman's friends had turned away.

The prosecution advanced two theories implicating defendant in the crime. One was simply that he was the triggerman; the other was that he aided and abetted in its commission.

The People offered the testimony of one Mose McCormick, a bus driver who observed the shooting from his bus window some 35 feet away. At trial, McCormick positively identified defendant as the shooter. Defendant attempted to impeach this identification by showing that McCormick was further away from the scene than he claimed to be—perhaps even by a factor of two—and by pointing out that McCormick had failed on three occasions before trial to pick defendant out of police photo and physical lineups. By way of rehabilitation, McCormick explained that the photos were not sharp enough to reflect certain of defendant's distinctive characteristics, and that he recognized defendant at one of the physical lineups but chose not to make this fact known to police at the time because he thought it would cause confusion in light of his previous misidentification.

The People also offered testimony from one of defendant's own companions—one Michael Player—who placed defendant among those returning to their cars from the spot where the shooting took place. Player did not, however, identify defendant as the executioner. Further evidence came from Michael Gipson who, in recounting the description of the gunman, described defendant as he appeared at the time of trial in every respect save a discrepancy in size, color, and grade of hair.[3]

---

[2] In fact, Phillips was a church usher and an active boy scout; at one time he had also been an altar boy.

[3] "Q. Michael, why do you say the defendant is not the person that shot Bradley Phillips? A. He don't look like the shooter that I saw. Q. What about him is different from the shooter?... THE WITNESS: Red hair, the style—... [a]nd the size. Q. I beg your pardon? A. The size and the color, the grade of his hair. Q. Of his hair? A. Uh-huh. Q. Anything besides the hair? A. No...."

Similarly, a fourth eyewitness, Deryl Wade, described the gunman as being the same height as defendant, but having lighter colored and shorter hair, much like Bradley Phillips'.

The People then showed that defendant's hair had darkened and lengthened since the time of the offense, when it was "very similar" to that of Bradley Phillips.

At the time defendant was arrested, he denied being present at the scene of the murder. At trial, however, he called two fellow gang members who testified that although defendant was indeed a driver of one of the three cars, at no time had he actually left his vehicle. Indeed, his mother claimed that although he had been a member of the Cripts in the past, he was not so affiliated in April 1977.

The People also called Deputy Sheriff Herbert Giron, who testified at some length regarding the general social customs, mores, and practices of south central Los Angeles street gangs. According to Deputy Giron, a person who lives in the territory of a particular gang is automatically associated with that gang by members of rival gangs. Further, fist fights between two rival gang members do not usually occur in the territory of one of the gangs, but would rather take place at "mutual" sites such as schools; if a gang traveled to a rival gang's territory, one would expect more than just a fist fight. He also admitted that it was unusual for various Cripts factions to band together when taking retaliatory action, although he had experienced situations where such alliances had been made.

Defendant, on the other hand, elicited testimony from his friends that the purpose of the trip to the Fives' territory was merely to fight "heads up"—i.e., fist fight—in order to even up the score between one of the Cripts and a Five who had bettered him in a confrontation earlier that day. The witnesses were in disagreement on the question whether only one Cripts member intended to fight, or whether wholesale retaliation was contemplated.

## DISCUSSION

Defendant asserts essentially two bases for reversal: first, that the evidence presented was insufficient to support the verdict, and second, that

the court erred in permitting Deputy Giron to testify concerning the "sociology and psychology of gangs." Neither argument is persuasive.[4]

■  With regard to defendant's first allegation, namely, that the record lacks substantial evidence to support his conviction, we note preliminarily that "when the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand . . . . [¶] The same rule applies when the defect in the alternate theory is not legal but factual, i.e., when the reviewing court holds the evidence insufficient to support the conviction on that ground." (*People* v. *Green* (1980) 27 Cal.3d 1, 69, 70 [164 Cal.Rptr. 1, 609 P.2d 468].) In this case, the record fails to reveal on which theory the jury predicated its verdict. We have reviewed the record for evidence sufficient to substantiate defendant's conviction on both proffered theories. It is not wanting.

As far as the People's theory that defendant was the gunman is concerned, we need do little more than observe that the case boils down to an old-fashioned swearing contest between prosecution and defense witnesses; it is, of course, beyond our domain to second-guess the jury's determination of credibility. Surely, we need not detail how the jury could have reasonably concluded that it was defendant who pulled the trigger: the facts speak for themselves. Indeed, the only significant argument advanced by defendant to challenge this theory—that McCormick's identification of him was untrustworthy because of his pretrial misidentifications—may be dismissed with the observation that other probative evidence substantially corroborated McCormick's testimony.

Similarly, we are satisfied that substantial evidence exists to uphold the jury's determination that defendant aided and abetted in the commission of the murder by assisting the perpetrator with knowledge of his wrongful purpose, or by sharing his evil intent. (See *People* v. *Vas-*

---

[4]Coupled to the first allegation is the argument that the court erroneously denied defendant's motion for judgment of acquittal made at the close of the prosecution's case in chief. Appended to both the first and second contentions is defendant's insistence that the court abused its discretion in denying his motion for new trial. Since these ancillary charges raise no independent issues of law or fact, they fall with the general allegations discussed in the body of this opinion.

*quez* (1972) 29 Cal.App.3d 81, 87 [105 Cal.Rptr. 181].) "Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense. [Citations.] In addition, flight is one of the factors which is relevant in determining consciousness of guilt. [Citation.]" (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094, 1095 [126 Cal.Rptr. 898].)

Here, four witnesses placed defendant among the persons who cornered and stood over Phillips before he was shot, whether or not defendant pulled the trigger.[5] Moreover, the evidence was uncontradicted that defendant was one of those present at the discussions held by the Cripts immediately before their venture was undertaken, and that, along with the others, he departed the murder scene as soon as the shooting had occurred. Further, he later falsely denied his presence at the event. Under the reasoning of *In re Lynette G., supra*, the foregoing evidence is sufficient to sustain defendant's conviction under an aiding and abetting theory.

■ Second, defendant contends that the trial court erred prejudicially in admitting Deputy Giron's testimony "relating to the sociology and psychology of gangs."

Initially, defendant insists that Deputy Giron's qualifications were insufficient for the court to allow him to testify as an expert on gang matters. We disagree. The officer established his credentials as follows: six and one-half years assignment to the sheriff's street gang detail in south central Los Angeles; he was told to ascertain "the number of and find out as much as best [he could] the names of people who belong to the various gangs in that particular station's area" by gathering information from "crime reports, interviews...of people in custody, and conversations with young people on the streets." In addition, Deputy Giron stated that "as part of [his] duties [he had] made an effort to study the social customs, methods of operation of gangs in south central Los Angeles." We are unable to discern why defendant insists that the foregoing so utterly fails to reflect sufficient familiarity with south central Los Angeles gangs that the court may be said to have abused its discretion in permitting Deputy Giron to testify as an expert thereon. (See Evid. Code, § 720.)

---

[5]Player placed defendant in the group, but did not identify him as the shooter.

■ Further, defendant insists that Deputy Giron's testimony was rife with opinions based on improper hearsay sources. To this objection we need merely note that Evidence Code section 801 states clearly: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:...(b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates...." Defendant has made no showing that the matter relied on here was other than of "a type that reasonably may be relied upon by an expert." Indeed, as the Law Revision Commission comment to section 801 notes, "[t]he variation in the permissible bases of expert opinion is unavoidable in light of the wide variety of subjects upon which such opinion can be offered. In regard to some matter of expert opinion, an expert *must*, if he is going to give an opinion that will be helpful to the jury, rely on reports, statements, and other information that might not be admissible evidence." Such was necessarily the case, we think, with regard to the type of sociological evidence presented in this instance.

Finally, defendant maintains that the testimony was substantially more prejudicial than probative (see Evid. Code, § 352), and that reversal is mandated on this ground alone. The argument is meritless, however, for whatever relative probative and prejudicial values one might wish to assign to the challenged evidence, it is clear in light of the record that the entirety of Giron's testimony was nothing more than icing on a very rich cake.

There was no error.

Affirmed.

Ashby, J., and Hastings, J., concurred.