[Nos. G014071, G014235. Fourth Dist., Div. Three. Dec. 30, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
CESAR JAVIER OLGUIN et al., Defendants and Appellants.

**COUNSEL**

Phillip I. Bronson and Terrence Verson Scott, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Janelle B. Davis and Esteban Hernandez, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BEDSWORTH, J.\***—Cesar Javier Olguin and Francisco Calderon Mora were convicted of second degree murder for the killing of John Ramirez. In addition, firearm and criminal street gang enhancements were found to be true. Both defendants appealed on several grounds,[1] and we consolidated the cases for review.

### I

In March 1992, Olguin lived on West Elder in Santa Ana, two houses away from the intersection of Elder and Shelley. He spray-painted the phrase "BSSR FTR El Cisco" on the street curb in the intersection, staking territorial claim to the area. The graffiti referred to the Southside F Troop street gang (Southside) and his nickname, El Cisco. Later, Olguin noticed someone had crossed out his graffiti by spray-painting a line through it and writing the Shelley Street gang's logo nearby. Although he knew Shelley Street was a defunct gang, Olguin assumed one of its former members had defaced his graffiti. He interpreted it as a sign of disrespect and a challenge to his territorial claim.

In the late afternoon of March 27, Olguin, along with Mora and Jesse Hilario, two other Southside members, looked at the crossed-out graffiti. Mora and Hilario agreed to go with Olguin to discover who did it. Olguin had a loaded handgun tucked in his waistband covered by his coat and shirt. He later claimed the weapon was solely for protection and that he did not tell Mora and Hilario he was armed.

The three encountered Eugene Hernandez and Robert Ulloa near the corner of Elder and Shelley Streets. Mora asked Hernandez if he belonged to the Shelley Street gang. Hernandez said no. Mora then asked Hernandez who crossed out Southside's graffiti. Hernandez said a relative of his did it. Mora, Olguin and Hilario began walking away.

Unfortunately, Hernandez's cousins, April Martinez and John Ramirez, came by at this moment. Hernandez told them what had transpired, and Ramirez, who had been drinking, walked past Hernandez, following the

<hr />

*Judge of the Orange Superior Court sitting under assignment by the Chairperson of the Judicial Council.

[1] One complaint can be disposed of summarily. Mora's challenge to CALJIC No. 2.90, the standard reasonable doubt instruction, has been rejected at virtually every level now. (*Victor v. Nebraska* (1994) 511 U.S. __ [127 L.Ed.2d 583, 114 S.Ct. 1239]; see also *People v. Freeman* (1994) 8 Cal.4th 450 [34 Cal.Rptr.2d 558, 882 P.2d 249].) The issue has been rather conclusively resolved against his position.

three F Troopers and yelling "Shelley Street." They turned and walked back toward Ramirez, yelling "Southside." Ramirez confronted them at arm's length, and they continued yelling at each other for several seconds. Olguin later claimed he asked Ramirez if he had crossed out the graffiti, but Ramirez kept saying, "Shelley," and insisting it was his street. Olguin responded by saying the street belonged to him, and both men clenched their fists. Mora then punched Ramirez in the face, knocking him down.

As Hernandez and others began moving toward Ramirez to give him aid, he stood up and began walking toward Mora's group. Olguin pulled the gun from his waist and fired, killing Ramirez with a single shot to the chest. Then he ran away with Mora and Hilario. Olguin testfied he only took the gun out because he thought the people moving toward him were armed and claimed the gun discharged accidentally when Ramirez grabbed it, but that version was contradicted by another witness.

Terry Zlateff, the lead investigator on the case and an expert on street gangs described Southside F Troop as an Hispanic gang of approximately 100 members that claims territory in southwest Santa Ana. Zlateff discussed the importance of territoriality to Hispanic gangs, explaining that graffiti is used to mark the gang's territory and that crossing out a gang's graffiti is a form of disrespect. Respect, usually in the form of fear, is of paramount importance to Hispanic gangs, so crossing out graffiti or calling out a gang's name to members of a rival gang—another demonstration of disrespect—often results in a violent confrontation. Mutual challenges of this sort have become the expected prelude for violent confrontations between gang members, especially where groups have gathered or weapons are available.

The criminal street gang enhancement was tried in a bifurcated hearing at which the evidence presented during the guilt phase was considered. Zlateff was the sole witness. He opined two other offenses had been committed by Southside members for the gang's benefit: an August 1989 attempted murder and a July 1991 homicide. Zlateff also expressed the opinion Ramirez's murder was a crime committed for the benefit of Southside. A certified copy of the court records in the prosecution leading to a conviction in the July 1991 case was admitted. The trial court also took judicial notice of *People* v. *Gamez* (1991) 235 Cal.App.3d 957 [286 Cal.Rptr. 894], which affirmed a conviction for the August 1989 attempted murder and a finding the crime was committed for Southside's benefit.

## II

Both defendants object to the trial court's admission of evidence third persons threatened Robert Ulloa after the Ramirez shooting. During

redirect, Ulloa admitted he left the scene of the shooting and did not voluntarily provide information to the police, explaining, "I didn't want anything to happen to my house or to my family." Over objection, Ulloa testified someone telephoned him a few days after the shooting saying they knew where he lived and he had better watch his back. When Ulloa asked the caller for her name, she replied, "Don't worry about it. Go, Southside Gang." Subsequently, someone spray-painted the word "Rata" (Spanish for "rat") on his driveway. The trial court admonished the jury this evidence could only be used "as it has relevance, if any, to the witness' state of mind, attitude, actions, bias, prejudice, lack or presence thereof."

Mora argues this was inadmissible evidence of third party attempts to suppress evidence; Olguin contends the trial court abused its discretion by not excluding it under Evidence Code section 352. Both are wrong.

The trial court correctly limited the evidence to "the witness' state of mind, attitude, actions, bias, prejudice, lack or presence thereof," and we presume the jury adhered to the trial court's limitations on this testimony. (*People* v. *Ballard* (1988) 203 Cal.App.3d 311, 320 [249 Cal.Rptr. 806]; *People* v. *Zack* (1986) 184 Cal.App.3d 409, 416 [229 Cal.Rptr. 317].) ▌ "Evidence a witness is afraid to testify is relevant to the credibility of that witness and is therefore admissible. (Evid. Code, § 780; *People* v. *Warren* (1988) 45 Cal.3d 471, 481 [247 Cal.Rptr. 172, 754 P.2d 218].) Testimony a witness is fearful of retaliation similarly relates to that witness's credibility and is also admissible. (*People* v. *Malone* (1988) 47 Cal.3d 1, 30 [252 Cal.Rptr. 525, 762 P.2d 1249].) It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible. (*People* v. *Green* (1980) 27 Cal.3d 1, 19-20 [164 Cal.Rptr. 1, 609 P.2d 468] [testimony witness was afraid to go to jail because defendant had friends there relevant to witness's credibility].)" (*People* v. *Gutierrez* (1994) 23 Cal.App.4th 1576, 1587-1588 [28 Cal.Rptr.2d 897].)

▌ Mora correctly points out that California law prohibits proving consciousness of guilt by establishing attempts to suppress evidence unless those attempts can be connected to a defendant. (*People* v. *Hannon* (1977) 19 Cal.3d 588, 596-600 [138 Cal.Rptr. 885, 564 P.2d 1203]; *People* v. *Weiss* (1958) 50 Cal.2d 535, 551-554 [327 P.2d 527].) But that was not done here. There was never an argument, never even a suggestion, that this evidence reflected consciousness of guilt. It was strictly limited to establishing the witness's state of mind. For this purpose it was highly relevant.

A witness who testifies despite fear of recrimination of *any* kind by *anyone* is more credible because of his or her personal stake in the testimony. Just as the fact a witness expects to receive something in exchange for

testimony may be considered in evaluating his or her credibility (*Calvert* v. *State Bar* (1991) 54 Cal.3d 765, 777 [1 Cal.Rptr.2d 684, 819 P.2d 424]), the fact a witness is testifying despite fear of recrimination is important to fully evaluating his or her credibility. For this purpose, it matters not the source of the threat. It could come from a friend of the defendant, or it could come from a stranger who merely approves of the defendant's conduct or disapproves of the victim. It could come from a person who perceives a social or political agenda to have been advanced by the defendant's actions. It could come from a member of the witness's profession, religion, or subculture, who disapproves of the witness's involvement for some reason. It could come from a zealot of any stripe, large groups of whom seem ready to rally to virtually any cause these days.

Regardless of its source, the jury would be entitled to evaluate the witness's testimony *knowing* it was given under such circumstances. And they would be entitled to know not just that the witness was afraid, but also, within the limits of Evidence Code section 352, those facts which would enable them to evaluate the witness's fear. A witness who expresses fear of testifying because he is afraid of being shunned by a rich uncle who disapproves of lawyers would have to be evaluated quite differently than one whose fear of testifying is based upon bullets having been fired into her house the night before the trial. The trial court acted well within its discretion in insuring the jury would have such evidence and would properly evaluate it.

## III

Both Mora and Olguin renew their trial level attacks on the expert testimony of Officer Zlateff regarding street gangs. Their arguments center around purported foundational weaknesses in the testimony and complaints the trial court should have excluded it under Evidence Code section 352. We find no infirmity in its admission.

The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason. (*People* v. *Funes* (1994) 23 Cal.App.4th 1506, 1519 [28 Cal.Rptr.2d 758].) Evidence of gang activity and affiliation is admissible where it is relevant to issues of motive and intent (*id.* at p. 1518; *People* v. *Maestas* (1993) 20 Cal.App.4th 1482, 1497 [25 Cal.Rptr.2d 644]), and, while admissible evidence often carries with it a certain amount of prejudice, Evidence Code section 352 is designed for situations in which evidence of little evidentiary impact evokes an emotional bias. (*People* v. *Wright* (1985) 39 Cal.3d 576, 585 [217 Cal.Rptr. 212, 703 P.2d 1106].)

Here, Zlateff's testimony was relevant to explain the defendants' desire to discover who crossed out their graffiti and their violent reaction when Ramirez appeared and began yelling, "Shelley Street." It was highly probative on the issues of intent and motive. While defendants' gang membership and their gang activities were prejudicial to a certain degree, the evidence was highly relevant to the prosecution's theory of how and why Ramirez was killed. (*People* v. *Maestas, supra,* 20 Cal.App.4th at p. 1497.) The trial court properly exercised its discretion in allowing Zlateff's testimony on gangs.[2]

■ Olguin contends Zlateff's opinion concerning Southside's response to the defacing of their graffiti lacked a proper foundation. He notes Zlateff admitted he could not recall any instances of violence erupting after Southside's graffiti had been crossed out and could not provide statistics on the percentage of cases where defaced gang graffiti resulted in violence.

But Zlateff did not testify about Southside's reaction to the crossing out of its graffiti. His opinion on this matter related to street gangs in general. For this testimony, the foundation was unobjectionable. In *People* v. *Gamez, supra,* 235 Cal.App.3d 957, we held police officers testifying as gang experts presented an adequate foundation for their opinions where they based their testimony on "personal observations of and discussions with gang members as well as information from other officers and the department's files." (*Id.* at p. 966.) Zlateff's opinion that gangs generally react violently to the crossing out of their graffiti was based on his investigation of cases over several years, his interviews with gang members and others, and his review of police reports. He knew of at least one other killing resulting from the crossing out of graffiti and numerous shootings caused by it, including at least six cases he personally investigated. In addition, other cases he had investigated or read about involved stabbings, weapons brandishing and fist fights prompted by such actions. This was sufficient foundation. (*People* v. *Citrino* (1970) 11 Cal.App.3d 778, 783 [90 Cal.Rptr. 80] [trial court's foundational finding upheld if substantial evidence supports it and proper procedures followed].)

■ Mora argues Zlateff's opinions exceeded the permissible scope of expert testimony because "it was . . . Zlateff who drew the inferences from evidence, not the trier of fact." Zlateff's testimony did not exceed its permissible scope. The use of expert testimony in the area of gang sociology and psychology is well established. (*People* v. *Gamez, supra,* 235

[2]Mora's reliance on *People* v. *Luparello* (1986) 187 Cal.App.3d 410 [231 Cal.Rptr. 832] is misplaced. There the prosecution attempted to introduce evidence of street gang membership of the killer into a murder case which had no other relationship to gangs. Those facts are inapposite to ours.

Cal.App.3d at p. 966; *People* v. *McDaniels* (1980) 107 Cal.App.3d 898, 904-905 [166 Cal.Rptr. 12].) The requirements for expert testimony are that it relate to a subject sufficiently beyond common experience as to assist the trier of fact and be based on matter that is reasonably relied upon by an expert in forming an opinion on the subject to which his or her testimony relates. (Evid. Code, § 801; see also *People* v. *Gamez*, *supra*, 235 Cal.App.3d at p. 965.) Such evidence is admissible even though it encompasses the ultimate issue in the case. (Evid. Code, § 805; *People* v. *Gamez*, *supra*, 235 Cal.App.3d at p. 965.) The reason for defendants seeking out the person who crossed out their graffiti and their violent response to Ramirez's yelling, "Shelley Street," were matters sufficiently beyond common experience to require interpretation by one having in-depth knowledge of street gangs, thus bringing those matters within Evidence Code section 801's requirements.

*People* v. *Hernandez* (1977) 70 Cal.App.3d 271 [138 Cal.Rptr. 675] is inapposite. There, a police officer opined defendant's conversation with four persons was a drug transaction because they continually looked at defendant's hands during the conversation, and further testified that the shaking of his head from side to side when approached by another group indicated defendant had no more drugs. The court correctly explained, "The officer was no more expert than the jurors concerning the significance of the fact that the four persons kept looking at the area where defendant had his hands. Nor did the officer's expertise add any probative value to defendant's shaking of his head from side to side when he was approached by two other persons." (*Id.* at p. 281.) Here, the defendants' interest in who crossed out their graffiti and the violent reaction engendered by the shouting of geographical names presented a much more arcane situation, properly interpreted for the jury.

Mora's final contention regarding this evidence is that Zlateff was allowed to express an opinion on Mora's subjective expectation that violence would occur, and since a natural and probable consequences theory of aider and abettor culpability requires an objective analysis, the admission of this evidence was erroneous. While Mora's legal contention might be correct (*People* v. *Brigham* (1989) 216 Cal.App.3d 1039, 1051 [265 Cal.Rptr. 486]), the factual premise is invalid. Contrary to Mora's claim, the trial judge precluded Zlateff from expressing an opinion on Mora's state of mind. Before the jury, Zlateff testified as follows: "Q. Now, do you have an opinion as to a gang member's expectation of what will result from, let's say, a mutual yelling out of gang names or affiliations? [¶] A. Yes. [¶] Q. And what is that opinion? [¶] A. The gang member would expect a violent confrontation." Thus Zlateff's testimony focused on what gangs and gang members typically expect and not on Mora's subjective expectation in this instance. We find no error in the admission of Zlateff's testimony.

## IV

Mora and Olguin next complain of the admission of rap lyrics found in a search of Mora's home three weeks after the crime. While a host of objections have been raised to them, we find the lyrics were admissible against Mora and properly limited to his culpability.

The lyrics (exhibits 12-A to 12-E) were handwritten on yellow paper. Exhibits 12-A and 12-B appeared to be slightly different versions of a song, as did 12-C and 12-D.[3] One song refers to its composer as "Vamp," Mora's gang moniker; the second song purports to be composed by "Franky," a nickname easily derived from "Francisco." They include references to Southside gang membership and could be interpreted as referring to disk-jockeying, a part-time employment of Mora.

█ Despite these facts pointing to Mora as their creator, he argues they were inadequately authenticated. We disagree. While Mora assumes authentication can be accomplished only through statutorily created means, Evidence Code section 1410 provides, "Nothing in this article shall be construed to limit the means by which a writing may be authenticated or proved," and California courts have never considered the list set forth in Evidence Code sections 1410-1421 as precluding reliance upon other means of authentication. (*Young* v. *Sorenson* (1975) 47 Cal.App.3d 911, 915 [121 Cal.Rptr. 236]

---

[3]Exhibit 12-A, as read by Zlateff, who also interpreted the lyrics, goes as follows: "Well my name is Vamp and Im here to say that I rapp into the beat and I do it this way let me tell you little Mecos let me show you where where at they call me Vampiro and yore about to get smac. Well Im gona talk about this sorry gang we call them . . the Mocos the new fools in town Meco slapps there a bunch of smacks. Picking on girls and you think youre bad well the only bad about you is just the smell so stay away from me cause you stink like hell. Meco side are a bunch of ratas you slap them once and their like little muchachas. What—what Im saying is that Mocos ain't nada you fuck with me and Ill turn you into cause Im frome a gang that has respect not like the Mecos they think you're dead. See my home girl Smiley told me about you rats if you fuck with her Ill put my foot in your ass Im talking frome the heart Im crazy Vamp with the . . . DSGSA 'F Troop Gang.' "

Exhibit 12-C, as read by Zlateff, goes as follows: "Special Introductions frome the South Side Gang. [¶] We ware born and raised in Santana when we see that Chacha Quintana Ima shootin in the head make him jump like a rana just to let him know whose controling Santana. Just crazy surenos smoking Marijuana and if you don't like it I sujest you break wide and if you don't stay, then you won't survive. Well make you bleed will let you know that were from DS. G. Cause Ill be the vato you be having in your dreams . . . you wake up all shety and sweaty and then you realize that Im worser than Fredy cause you know were crazy vatos that don't fuck around Im that rapper they call Franky straight from the south Ill always be. I keep riming do it by my self I don't need your friendship or your help just give me the mic and Ill rock your world with my visius voice Ill take control of your body and soul. When I walk out my door I have to pack my forty four. R.I.P. there a bunch of punks they will get beat were the South Side Trooper were number 1."

The contents of exhibit 12-E were not discussed on the record.

[circumstantial evidence may be used for authentication].) Both the content and location of these papers identified them as the work of Mora. (*People* v. *Ramsey* (1948) 83 Cal.App.2d 707, 722 [189 P.2d 802], disapproved on other grounds in *People* v. *Brown* (1958) 49 Cal.2d 577, 584 [320 P.2d 5].) Unlike *O'Laskey* v. *Sortino* (1990) 224 Cal.App.3d 241 [273 Cal.Rptr. 674], upon which he relies, this was not a case in which the date of creation of the work was critical. Regardless of whether these lyrics were written before or after the killing, they were adequately authenticated as the work of Mora. As such, they demonstrated his membership in Southside, his loyalty to it, his familiarity with gang culture, and, inferentially, his motive and intent on the day of the killing. The trial court properly admitted them, carefully limiting them to those purposes.

■ Mora contends they were inflammatory because they contain general threats of violence and their admission violated Evidence Code section 352. But as we have noted above, the trial court exercises broad discretion in this area: "Where . . . a discretionary power is inherently or by express statute vested in the trial judge, his or her exercise of that wide discretion must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People* v. *Jordan* (1986) 42 Cal.3d 308, 316 [228 Cal.Rptr. 197, 721 P.2d 79].) We cannot say that here.

This was a crime alleged to be gang related. Gang membership was obviously important, and evidence tending to show it was highly relevant. (*People* v. *Maestas*, *supra*, 20 Cal.App.4th at p. 1497, and cases cited therein.) The mere fact the lyrics might be interpreted as reflective of a generally violent attitude could not be said "substantially" to outweigh their considerable probative value. It looks to us like the trial court got it right; certainly it has not been shown there was any abuse of discretion.[4]

■ Olguin's complaint is that the lyrics amounted to inadmissible character evidence and violated his right to confrontation. As we have discussed, however, this was not character evidence, and it was *not* admitted

---

[4]The case law Mora relies on is inapposite because it did not involve gang-related crimes. In fact, one case Mora cites actually contradicts his argument. In *State* v. *Rice* (1972) 188 Neb. 728 [199 N.W.2d 480], the defendants were convicted of murdering a police officer killed when a bomb enclosed in a suitcase exploded while he was inspecting it. The prosecution introduced newsletters containing articles by each defendant. Some of the articles concerned defendants' hatred of police and advocated violence against them, and other articles dealt with unrelated subjects. The Nebraska Supreme Court held the articles on the police were admissible to establish the defendants' intent, malice and motive. (*Id.* at pp. 746-747 [199 N.W.2d at pp. 491-492].) Here, the lyrics dealt with Mora's opinions concerning rival gangs and gang members.

against Olguin. ▆▆ ▆▆ The trial court specifically admonished the jury not to consider the lyrics against Olguin, and, except in limited circumstances, only one of which applies here and is discussed below, jurors are presumed to adhere to the court's instructions absent evidence to the contrary. (*People* v. *Hill* (1992) 3 Cal.4th 959, 1011 [13 Cal.Rptr.2d 475, 839 P.2d 984]; *People* v. *Pinholster* (1992) 1 Cal.4th 865, 919 [4 Cal.Rptr.2d 765, 824 P.2d 571]; *People* v. *Bonin* (1988) 46 Cal.3d 659, 699 [250 Cal.Rptr. 687, 758 P.2d 1217].) Nothing in this record indicates the jury failed to comply with the trial court's admonition.

▆▆ One exception to the presumption jurors follow the court's instructions arises when the prosecution seeks to introduce the extrajudicial statements of a nontestifying codefendant. (*Bruton* v. *United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]; *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].) These cases hold it is error in a joint trial of two or more defendants to admit the statement or confession of a nontestifying defendant that inculpates another defendant or defendants, even when the jury is instructed to consider the statements only as to the declarant. (*Bruton* v. *United States, supra,* 391 U.S. at pp. 127-128 [20 L.Ed.2d at pp. 480-481]; *People* v. *Aranda, supra,* 63 Cal.2d at pp. 528-530.) ▆▆ Olguin argues Mora's lyrics constitute admissions and thus the *Bruton-Aranda* exception applies to this case. He is wrong.

▆▆ In *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], the California Supreme Court explained the scope of the *Bruton-Aranda* rule: "[A]ll statements inculpating the declarant codefendant and the other defendant appear to fall within the rationale of the rule. . . . [W]hat is material for *Bruton-Aranda* analysis is not *how* the statement under review should be classified in the abstract—as a confession, an admission, or even an exculpatory declaration—but rather *whether on the facts of the individual case it operates to inculpate the other defendant.*" (*Id.* at p. 1123.) The rationale for *Bruton-Aranda* is that self-incriminating extrajudicial statements by a nontestifying codefendant inculpating another defendant are generally unreliable and therefore violate that defendant's right to confrontation and cross-examination. Furthermore, the risk that the jury will be unable to follow an instruction limiting the extrajudicial statements to the declarant is too great to ignore. (*Bruton* v. *United States, supra,* 391 U.S. at pp. 126-137 [20 L.Ed.2d at pp. 479-485]; *People* v. *Anderson, supra,* 43 Cal.3d at pp. 1120-1121; *People* v. *Vasquez Diaz* (1991) 229 Cal.App.3d 1310, 1314-1315 [280 Cal.Rptr. 599].)

▆▆ But the *Bruton-Aranda* rule does not apply here. Even if we assume, arguendo, that these were admissions by Mora, they do not inculpate

Olguin any more than they would inculpate any of a hundred other Southside F Troopers. The lyrics do not mention the crime for which Mora and Olguin were on trial,[5] and provide absolutely no information about the crime which could be imputed to Olguin.[6] They do reflect gang morals and values, but no case has ever extended *Bruton-Aranda* so far as to hold that it applies to circumstantial evidence of gang activities, and we decline to do so here. Nothing makes these rap lyrics inherently unreliable—at least no more unreliable than rap lyrics in general—and there is little risk the jury would find them so authoritative as to overwhelm their ability to follow the instruction to consider them only against Mora. Thus neither of the underlying premises upon which the *Bruton-Aranda* rule is based are operable here, and neither is the rule.

## V

Mora has two complaints about being convicted as an aider and abettor in the shooting of Ramirez. First, he insists his conviction cannot be based on the theory Ramirez's murder was a reasonably foreseeable consequence of other criminal conduct because he was the perpetrator—not the aider and abettor—of the only preshooting criminal conduct: the one-punch knockdown of Ramirez. Alternatively, he contends the instructions on this point were erroneous because the trial court modified CALJIC No. 3.02 to delete the second paragraph specifying the predicate offense of which murder was the reasonably foreseeable consequence.

Mora is correct that he was not an aider and abettor in the assault on Ramirez. He was the perpetrator of the assault. However, Mora infers from this fact that the law pertaining to criminal liability for the natural and foreseeable consequences of that assault does not apply to him. He argues only aiders and abettors are so liable and therefore he is not responsible for

---

[5] The trial judge edited the lyrics to excise the portion the jury might use to implicate the defendants in Ramirez's death ("I'm wanted by the D.A. for commiting a crime. I smack a litle moco now Im doing time"). She also admonished the jury the reference to the Quintana family could be used only as it tended to show Mora's knowledge of a traditional enemy of Southside and his intent concerning Southside's enemies, and that this reference could not be considered as relating to any shooting of a Quintana member.

[6] Olguin claims one of the rap songs contained his gang moniker, El Cisco. The record fails to support this contention as well. During argument on the lyrics' admissibility outside the jury's presence, Olguin's counsel claimed El Cisco appeared in one of the documents. During Zlateff's testimony, he read exhibits 12-A and 12-C and testified exhibits 12-B and 12-D were slightly different versions of each song. Neither exhibit 12-A nor exhibit 12-C referred to El Cisco. The contents of exhibit 12-E are not disclosed by the record. However, exhibit 13, which was discussed at the same time as exhibits 12-A through 12-E but subsequently withdrawn by the prosecution, contained a roster of Southside gang names. Presumably, it was the latter exhibit which contained the reference to El Cisco.

Olguin shooting Ramirez as he got up to respond to the punch. This argument is flawed.

The flaw in Mora's reasoning is that a perpetrator of an assault and an aider and abettor are *equally* liable for the natural and foreseeable consequences of their crime. Both the perpetrator and the aider and abettor are principals, and *all* principals are liable for the natural and reasonably foreseeable consequences of their crimes. ▮ Penal Code section 971 provides that all persons concerned in the commission of a crime, "shall hereafter be prosecuted, tried and punished as principals . . . ." "Reasonably construed, this section expresses a legislative intent to abolish the distinctions made at common law as to the various types of participants in the commission of a crime and to make all of them subject to the same procedural and substantive limitations." (*Bompensiero* v. *Superior Court* (1955) 44 Cal.2d 178, 186 [281 P.2d 250].)

▮ Mora's argument thus proves too much. Since he concedes he punched Ramirez, the only unresolved issue regarding his liability for the shooting was whether it was a natural and probable consequence of that punch. This was a factual issue to be resolved by the jury. (*People* v. *Godinez* (1992) 2 Cal.App.4th 492, 499 [3 Cal.Rptr.2d 325].) Clearly, the jury thought the shooting was such a consequence and so indicated in its verdict. Given the intensity of Mora's gang loyalty, as reflected in the rap lyrics discussed above, the fact he knew Olguin was unhappy enough about having his graffiti defaced to arm himself and recruit Mora and Hilario to seek out the perpetrator of that insult, the fact all three were shouting at Ramirez when Mora punched him, and the fact Ramirez did not appear intimidated by being outnumbered, escalation of this confrontation to a deadly level was much closer to inevitable than it was to unforeseeable, so there is little room to quarrel with the jury's conclusion.

In fact, this case aptly demonstrates the folly of Mora's position. If it were adopted, Hilario, who did nothing but stand by and watch, could be convicted of murder if the jury were convinced he was there to back up his homeboys and thereby encouraged Olguin and Mora in the assault on Ramirez. But Mora, who actually perpetrated the assault, would escape liability on the basis that he was the party who initiated the action.

Fortunately, that is not the law. Mora was a principal in the assault on Ramirez and therefore responsible for the natural and probable consequences of that assault. It is unfortunate none of the parties below recognized their mischaracterization of Mora's role, but it is not reversible error. Since Mora *concedes* he was the perpetrator of the assault—a fact the witnesses agreed

upon—thereby bringing him within the scope of liability as a principal, he could only have benefited from being tried as an aider and abettor. In essence, the prosecution successfully assumed the burden of proving to the jury more about Mora than the law required. This was harmless error. (*People* v. *Guiton* (1993) 4 Cal.4th 1116, 1129-1131 [17 Cal.Rptr.2d 365, 847 P.2d 45] [while it is error to instruct jury on legal principles that are not applicable to the case, the error is harmless if there is no reasonable probability a more favorable result would have been achieved by the defendant.].)

■ This also disposes of Mora's contention the trial court erred in modifying CALJIC No. 3.02. The trial court gave the jury CALJIC No. 3.00 (Principals-Defined), CALJIC No. 3.01 (Aiding and Abetting-Defined) and a modified version of CALJIC No. 3.02, consisting of the standard instruction's first paragraph and defense special instruction No. 5. The modified instruction said, "One who aids and abets another in the commission of a crime or crimes is not only guilty of that crime or those crimes, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime or crimes originally aided and abetted." (CALJIC No. 3.02.) "Before a defendant may be found guilty of the crime charged as an aider and abettor the jury must find that the defendant had the following state of mind: [¶] One, a knowing intent to assist the perpetrator's commission of the crime; that is, that the defendant's acts were undertaken with the intent that the actual perpetrator's purpose be facilitated thereby; and [¶] Two, that the resultant offense of the perpetrator was one that the defendant intended to facilitate or encourage or was a reasonably foreseeable offense by the person he aided and abetted or a natural and probable consequence of the criminal act knowingly and intentionally encouraged. [¶] You are not permitted to assume that a crime committed by the perpetrator was a natural and probable consequence of the crime intended by the perpetrator but you must consider the evidence and determine whether the act committed was in fact a natural and probable consequence of the criminal act knowingly and intentionally encouraged. That fact must be determined and found by the jury before the defendant may be found guilty as an aider and abettor of any unplanned act of the perpetrator." (Defense special instruction No. 5.) CALJIC No. 3.02's second paragraph was deleted.[7]

---

[7] CALJIC No. 3.02's second paragraph states as follows: "In order to find the defendant guilty of the crime[s] of _____, [as charged in Count[s] _____,] you must be satisfied beyond a reasonable doubt that: [¶] (1) The crime [or crimes] of _____ [was] [were] committed, [¶] (2) The defendant aided and abetted such crime[s], [¶] (3) A co-principal in such crime committed the crime[s] of _____, and [¶] (4) The crime[s] of _____ was a natural and probable consequence of the commission of the crime[s] of _____."

CALJIC No. 3.02 tells the jury how to assess the criminal liability of an aider and abettor for the natural and probable consequences of the underlying offense.[8] As the perpetrator of the assault on Ramirez, rather than the aider and abettor of it, Mora had no cognizable interest in any part of that instruction other than the part dealing with the natural and probable consequences of his crime. Since that area of the law was covered with scrupulous accuracy by the replacement instruction offered by Mora's attorney, we cannot find any error which would have affected Mora.

The instruction pieced together by the court more than adequately covered the concept of natural and probable consequences. In fact, as discussed above, it covered it in such a way as to require the prosecution to establish Mora's intention to facilitate the assault—something which would not have been necessary had the parties recognized what Mora so loudly proclaims now: He was the *perpetrator* of the assault.

We find the combination of the first paragraph of CALJIC No. 3.02 and the exhaustive special instruction crafted by Mora's trial counsel conveyed to the jurors the fact Mora was not guilty unless they found the shooting of Ramirez was a natural and probable consequence of the assault. The concept of natural and probable consequences was fully explained to the jury, and its verdict Mora was criminally responsible for the shooting of Ramirez as an aider and abettor necessarily includes responsibility as the perpetrator. Put more simply, there is no conceivable way the jurors could have analyzed Mora's criminal liability and found him guilty as an aider and abettor which would have led to a different result if they had analyzed his liability as a perpetrator of the assault. Any error here was harmless beyond a reasonable doubt. (*People* v. *Garceau* (1993) 6 Cal.4th 140, 185-187 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People* v. *Clair* (1992) 2 Cal.4th 629, 681, fn. 12 [7 Cal.Rptr.2d 564, 828 P.2d 705]; *People* v. *Cox* (1991) 53 Cal.3d 618, 668-669, fn. 16 [280 Cal.Rptr. 692, 809 P.2d 351].)

## VI

 Mora's argument that it was error to instruct on implied malice because his guilt as an aider and abettor required proof of specific intent has

---

[8]We are aware the proper employment of CALJIC No. 3.02 under facts such as the ones before us has divided the appellate courts. *People* v. *Solis* (1993) 20 Cal.App.4th 264 [25 Cal.Rptr.2d 184] and *People* v. *Mouton* (1993) 15 Cal.App.4th 1313 [19 Cal.Rptr.2d 423] appear to have come to opposite conclusions about the necessary description of the "target" or "underlying" offense. At least two cases presenting the issue—*People* v. *Prettyman* (1994) 34 Cal.App.4th 421 [29 Cal.Rptr.2d 299] review granted June 30, 1994 (S040008) and *People* v. *Hickles* (1994) 36 Cal.App.4th 72 [32 Cal.Rptr.2d 111] review granted October 13, 1994 (S041629)—are currently before the California Supreme Court. For the reasons outlined above, we need not add to the debate.

been rejected by at least two other courts. (*People* v. *Francisco* (1994) 22 Cal.App.4th 1180 [27 Cal.Rptr.2d 695]; *People* v. *Torres* (1990) 224 Cal.App.3d 763 [274 Cal.Rptr. 117].) This will make three. Even assuming its application to a perpetrator of the underlying offense, we cannot adopt Mora's position.

Mora argues that aiding and abetting requires the "specific intent" to facilitate or commit the underlying offense. His argument is that "aiding and abetting" a murder therefore requires the specific intent to kill, which, according to *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 764-765 [175 Cal.Rptr. 738, 631 P.2d 446], "cannot coexist" with implied malice. Ergo instructions including both concepts were erroneous.

The argument is rather neatly constructed, yet Mora candidly admits his difficulty finding any decisional law even inferentially supporting it. This is because it proceeds from a faulty premise. It fails to distinguish between the specific intent of the perpetrators of the crime to commit the target offense and the specific intent of an aider and abettor to aid, facilitate, encourage, or promote *criminal conduct*. ▮ As was explained by our Supreme Court in *People* v. *Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392], an aider and abettor "need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which [*People* v. ] *Beeman* [(1984) 35 Cal.3d 547 (199 Cal.Rptr. 60, 674 P.2d 1318)] holds must be found by the jury."

▮ Thus the specific intent necessary for conviction of an aider and abettor in a murder would not be the specific intent to kill, but the intent to "encourage and bring about conduct that is criminal." The failure to draw this critical distinction, closely related to the flaw in Mora's preceding argument (pt. V, *supra*), has been at the bottom of a great deal of misunderstanding in cases such as this.

That misunderstanding was illuminated and dispelled in *People* v. *Torres*, *supra*, 224 Cal.App.3d at pages 768-771. While Mora derides *Torres* as containing "so little analysis or reasoning as to provide no basis for overturning this district's prior decisions," its analysis seems to us to be both thorough and wholly in keeping with the decisions of this district.

The claim in *Torres* was that while sale of heroin was a general intent crime, aiding and abetting in the sale required a "specific intent." The *Torres* court rejected this argument, holding, "In our view, aiding and abetting a general intent crime does not require a specific intent or an accompanying instruction to that effect." (224 Cal.App.3d at p. 770.) Likewise, under *Croy*, the only intent necessary for Mora's conviction as an aider and abettor would have been that he knew a criminal act was intended and himself acted with the intent to encourage or facilitate that act, whose reasonably foreseeable consequence was the murder of Ramirez.

The same conclusion was drawn earlier this year in *People* v. *Francisco*, *supra*, 22 Cal.App.4th 1180, under circumstances more similar to ours. Francisco was convicted as the aider and abettor in a drive-by shooting and complained that the instructions given would have allowed his conviction without proof of a specific intent to kill. The court explained Francisco's interpretation of the instruction was correct, and that was precisely the state of the law. "Appellant argues that the giving of CALJIC No. 3.02 means that appellant could be found guilty without a finding that he shared the perpetrator's intent to kill. As previously noted, this is not the test for aider and abettor liability. Such liability is a question of legal causation which is independent of any intent that the result in question occurred. (*People* v. *Anderson* (1991) 233 Cal.App.3d 1646, 1656 [285 Cal.Rptr. 523].) Thus the ultimate factual question is whether the perpetrator's criminal act, upon which the aider and abettor's derivative criminal liability is based, was '"reasonably foreseeable"' or the probable and natural consequence of a criminal act encouraged or facilitated by the aider and abettor. (*People* v. *Brigham*, *supra*, 216 Cal.App.3d at p. 1050.)" (*Id.* at p. 1190.)

We agree that no specific intent is required for liability as an aider and abettor other than the intent to aid, encourage, facilitate or promote a criminal act. If that intent is shown, it matters not that the crime actually committed was not intended by the aider and abettor, so long as it was a reasonably foreseeable consequence of the underlying criminal conduct. We therefore perceive no tension between the court's instruction on implied malice and Mora's liability as an aider and abettor, had he been one.[9]

---

[9]While the Attorney General is at great pains to analyze this argument in terms of both the prosecution's theories, aiding and abetting a planned homicide and aiding and abetting a gang fight which turned into a homicide, we believe the result is the same under either theory. But since Mora was the *perpetrator* of the underlying offense, the point is largely moot.

## VII

Without objection, the trial court instructed the jury with a series of CALJIC self-defense instructions which included CALJIC No. 5.55.[10] Counsel were specifically asked if they had any objection to this instruction and said they did not.[11] ▮ Mora now argues the instruction was erroneous as a matter of law because it does not require a specific intent to create a self-defense pretext for assault, and because it was inapplicable to the facts of the case.

We agree the instruction had no antecedent in the facts of this case. Neither we nor the Attorney General can find facts that would support it. But we are mindful of the trial court's unique position for determining such issues: "A trial judge's superior ability to evaluate the evidence renders it highly inappropriate for an appellate court to lightly question his determination to submit an issue to the jury. A reviewing court certainly cannot do so where, as here, the trial court's determination was agreeable to both the defense and the prosecution." (*People* v. *McKelvy* (1987) 194 Cal.App.3d 694, 705 [239 Cal.Rptr. 782] (lead opn. of Kline, P. J.).)

Nor are we convinced the instruction had any bearing on the outcome of the trial. It was part of a packet of a dozen self-defense instructions, some of which were mutually exclusive. It was obvious to anyone that not all of those instructions could apply to the case, and the jurors were specifically instructed they were to "Disregard any instruction which applies to facts determined by you not to exist." (CALJIC No. 17.31.) By all appearances, they understood their charge in this regard.

Mora suggests the instruction might have kept the jury from evaluating his self-defense claim, but we don't see how. This very same argument about the same instruction was made—and rejected—in *People* v. *Crandell* (1988) 46 Cal.3d 833 [251 Cal.Rptr. 227, 760 P.2d 423], where the court concluded, "we are confident the jury was not sidetracked by the correct but irrelevant instruction, which did not figure in the closing arguments, and we conclude that the giving of the instruction was harmless error. (See *People* v. *Rollo* (1977) 20 Cal.3d 109, 123 [141 Cal.Rptr. 177, 569 P.2d 771]; *Solgaard* v.

---

[10]"The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense."

[11]Mora's attorney expressed doubt about the applicability of CALJIC No. 5.56 (mutual combat), which was discussed immediately afterward, but had no objection to 5.55.

*Guy F. Atkinson Co.* (1971) 6 Cal.3d 361, 371 [99 Cal.Rptr. 29, 491 P.2d 821].)"[12] (*Id.* at pp. 872-873 (lead opn. of Kaufman, J.).) So do we.

## VIII

 Both Mora and Olguin have launched a series of assaults upon the jury's finding this crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (Pen. Code, § 186.22, subd. (b).) The easiest of these to deal with is the assertion this finding was unsupported by the evidence.

 Our role in considering an insufficiency of the evidence claim is quite limited. We do not reassess the credibility of witnesses (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303-304 [228 Cal.Rptr. 228, 721 P.2d 110]), and we review the record in the light most favorable to the judgment (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]), drawing all inferences from the evidence which supports the jury's verdict. (*People* v. *Alcala* (1984) 36 Cal.3d 604, 623 [205 Cal.Rptr. 775, 685 P.2d 1126].) By this process we endeavor to determine whether " '*any* rational trier of fact' " could have been persuaded of the defendant's guilt. (*People* v. *Johnson, supra,* at p. 576, quoting *Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573-574, 99 S.Ct. 2781].) Here there was an abundance of evidence to persuade a rational trier of fact.

The element in dispute is Penal Code section 186.22, subdivision (b)'s requirement that the crime be committed "for the benefit of, at the direction of, or in association with" a criminal street gang. Olguin argues the evidence indicates "that the shooting was caused by a personal, rather than a gang dispute." This is a plausible argument, and facts can be marshaled to support it, but the overwhelming evidence, which the jury adopted, was to the contrary.

The shooting was, after all, precipitated by crossing out gang graffiti, replacing it with the name of another gang, and then shouting that gang's name to rival gang members. The record reflects no prior relationship between the killers and their victim, and no reason for animosity other than

[12]Mora's contention CALJIC No. 5.55 is incorrect as a matter of law, based on Texas precedent holding that a *similar* instruction should have required a *specific* intent to create a pretext, will have to await another day. For the reasons outlined above, we do not believe the issue was preserved on appeal. (See *People* v. *Lang* (1989) 49 Cal.3d 991, 1024 [264 Cal.Rptr. 386, 782 P.2d 627] [party who did not request modification of appropriate instruction at trial level cannot complain on appeal instruction should not have been given].)

gang-related insults. While Olguin attempts to attach significance to the fact the Shelley Street gang so briefly and tragically claimed by Ramirez was long defunct, we see none. Regardless of the viability of the victim's allegiance, any rational trier of fact would have concluded he died not because he insulted Olguin, but because he disrespected Southside F Troop. The evidence was sufficient.

■ Mora, on the other hand, attacks the evidence supporting the allegation that Southside falls within Penal Code section 186.22's definition of a street gang. His argument is that the statutorily described "pattern of criminal gang activity," requiring, inter alia, the commission or attempted commission of two or more described offenses, was incorrectly and insufficiently established.

First he complains the charged offense cannot be considered as one of the predicate offenses establishing a pattern of criminal gang activity.[13] This argument has been repeatedly rejected by the appellate courts. Both *In re Lincoln J.* (1990) 223 Cal.App.3d 322, 328 [272 Cal.Rptr. 852] and *In re Jose T.* (1991) 230 Cal.App.3d 1455, 1463 [282 Cal.Rptr. 75] hold the charged offense can be considered as part of the pattern, and we see no reason to depart from their analysis.

*People* v. *Godinez* (1993) 17 Cal.App.4th 1363 [22 Cal.Rptr.2d 164], relied upon by Mora for the proposition that the predicate offenses must *precede* the charged offense, says no such thing. What it says is they cannot be offenses committed *after* the charged offenses. We certainly agree with that position, but cannot reason from it, as has Mora, to the proposition that they must *precede* the offense.

Mora seems to feel our opinion in *People* v. *Gamez, supra,* 235 Cal.App.3d 957, supports his position. But the quotations he has lifted from that case do not help him. We said, "Section 186.22 requires evidence of a gang's past criminal conduct and ongoing criminal nature." (*Id.* at p. 965.) It does. But it does not require that *all* the predicate offenses be in the past. If it did, we would have questioned *Lincoln J.*'s statement that it did not.

Mora also relies on our statement in *Gamez* that "an individual who violates subdivision (b) does so at the peril that the *history* of his gang will reveal the predicate offenses." (*People* v. *Gamez, supra,* 235 Cal.App.3d at

---

[13]While the statute does not use the word "predicate" it has become the accepted usage for reference to the statutorily required offenses. This is unfortunate since it implies precedence, which, as we explain, is not a requirement, but it seems too well entrenched in the case law to change now.

p. 976, italics added.) We assume from his italicizing of the word "history" that he infers from it a requirement that the described offenses be part of the past. This interpretation, however, misconstrues the nature of history. By definition, history is compiled *after* events. Therefore a gang's history, when written or spoken, would always include the charged offense. In short, neither our words nor our analysis conflicts with decisions holding that a pattern of gang activity may include the charged crime. We agree with *Lincoln J.* and *Jose T.* that it may.

Next Mora complains the 1991 homicide was not shown to have been committed for the benefit of Southside. The offense involved a Walnut Street gang member's argument with a Townsend Street gangster, who then recruited a Southside member to return with him, confront, and shoot three Walnut Streeters, killing one. Officer Zlateff, who investigated that case, opined it to be one which benefited Southside because it "promoted the respect of the Southside Gang."

It is difficult to imagine a clearer need for expert explication than that presented by a subculture in which this type of mindless retaliation promotes "respect." But Zlateff, who has dealt with street gangsters for over three years, explained that "respect" is often synonymous with fear among gangs, and his expertise enabled him to recognize the benefit Southside would realize from the fact another gang called upon one of its members when it needed serious muscle.[14]

This is simply not comparable to the discredited testimony in *In re Lincoln J.*, *supra*, 223 Cal.App.3d 322, in which the only offense other than the one charged was one in which the defendant and his fellow gangsters were the *victims* of a drive-by shooting. (*Id.* at p. 330.) Here a qualified expert testified the participation of a Southside gang member in a Townsend Street retaliation killing would benefit Southside by enhancing its "respect." It was for the jury to assess the weight of that testimony in the first instance, and since we believe a "rational juror" could have been convinced by it, we cannot deem it insufficient. (*People* v. *Lucero* (1988) 44 Cal.3d 1006, 1020 [245 Cal.Rptr. 185, 750 P.2d 1342].)

██ This brings us to Mora's contention that all of Zlateff's testimony was "conclusional" and "based on unspecified hearsay sources." We previously dealt with this contention in *People* v. *Gamez*, *supra*, 235 Cal.App.3d 957, explaining, "We fail to see how the officers could proffer an opinion

---

[14]We note that Zlateff, as the investigating detective in the 1991 killing, was in a unique position to evaluate its benefit to Southside and was available for cross-examination regarding the facts of that case and the relationship to this one.

about gangs, and in particular about gangs in the area, without reference to conversations with gang members. While the credibility of those sources may not be beyond reproach, nevertheless, as the court in [*People* v. ] *McDaniels* [*supra,* 107 Cal.App.3d 898] and the Law Revision Commission comments to Evidence Code section 801 note, '[t]he variation in the permissible bases of expert opinion is unavoidable in light of a wide variety of subjects upon which such opinion can be offered.' (*Ibid.*) To know about the gangs involved, the officers had to speak with members and their rivals. Furthermore, the officers did not simply regurgitate that which they had been told. Rather, they combined what they had been told with other information, including their observations, in establishing a foundation for their opinions. The statements of gang members, which in part formed the bases of the officers' opinions, were not recited in detail during the officers' testimony but were referenced in a more general fashion, along with other, corroborating information." (*Id.* at p. 968, fn. omitted.)

The same is true of the expert testimony in this case. While it is undeniably true that not every statement of the officer was annotated with factual referents, that is the nature of *all* opinion testimony. Indeed, the role of the expert is largely one of extrapolation from a set of known facts to an opinion about unknown ones. While that testimony cannot consist of an *opinion* that members of a gang have committed offenses—unsupported by *any* evidence of such crimes—as was attempted in *In re Leland D.* (1990) 223 Cal.App.3d 251, 258-259 [272 Cal.Rptr. 709], we see no reason why it cannot relate to the general characteristics of Hispanic street gangs and the ways in which such gangs typically seek "respect," the most hotly-contested gang issues in this case.

## IX

Mora's last swipe at the Penal Code section 186.22 allegation is a contention that the instruction defining "pattern of criminal gang activity" fails to track federal law pertaining to patterns of racketeering activity as those terms are used in the federal Racketeer Influenced and Corrupt Organizations Act (RICO). (18 U.S.C. § 1961 et seq.) He says the instruction should have included a requirement the gang's criminal actions "amount to or pose a threat of continued criminal activity." This he says is necessary because state courts have on occasion looked to explications of the RICO statute for guidance in interpreting Penal Code section 186.22, and RICO has been read to include this requirement.

That statement of the argument is probably its best refutation. That *People* v. *Gamez, supra,* 235 Cal.App.3d 957 and *People* v. *Green* (1991) 227

Cal.App.3d 692 [278 Cal.Rptr. 140] referred to federal RICO statutes to determine whether certain aspects of Penal Code section 186.22 pass constitutional muster hardly establishes a requirement that all aspects of RICO legislation be incorporated into California antistreet gang statutes. *H. J. Inc.* v. *Northwestern Bell Telephone Co.* (1989) 492 U.S. 229 [106 L.Ed.2d 195, 109 S.Ct. 2893] gleaned a requirement of "a threat of continued criminal activity" from a detailed and thorough analysis of the legislative history behind the RICO statutes. (*Id.* at p. 239 [106 L.Ed.2d at pp. 207-208].) That congressional legislative history is obviously inapplicable to Penal Code section 186.22, and we find nothing in the statute to suggest the requirement Mora now urges.

The trial judge properly instructed in the language of the statute, which includes no reference to any requirement of "a threat of continued criminal activity." *People* v. *Poggi* (1988) 45 Cal.3d 306 [246 Cal.Rptr. 886, 753 P.2d 1082] held, "The language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification." (*Id.* at p. 327.) This was precisely the case here.

The judgment is affirmed in each case.

Wallin, Acting P. J., and Crosby, J., concurred.

A petition for a rehearing was denied January 30, 1995, and respondent's petition for review by the Supreme Court was denied April 27, 1995.