Filed 4/19/21 (unmodified opn. attached)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>EDGAR ABELINO et al.,<br><br>    Defendants and Respondents. | A159088<br><br>(Del Norte County<br>Super. Ct. No. CRPB195062) |

THE COURT:

It is ordered that the opinion filed herein on March 29, 2021, be modified as follows:

1.   On page 18, in the second paragraph, the sentence beginning, "To the contrary, at least with respect to defendants Tagaban, . . . " is changed to:

>    To the contrary, at least with respect to defendants Tagaban, who had a gunshot wound, and Abelino, who had blood on his clothing, the magistrate commented that a more logical reading of the evidence was that they were "involved" in the assault on the officers or "in something."

2.   On page 22, the sentence beginning, "Then, about 20 seconds later, . . ." and the following sentence beginning, "An officer appeared in the inmate's path and extended his arm, . . ." are changed to:

>    Then, about 20 seconds later, he got up and quickly moved toward the vehicle gate.  An officer appeared in the inmate's path and extended his arm, the inmate stopped his forward progress, and, after a couple of seconds, the inmate got back down."

1

3.  On page 23, the following paragraph and accompanying footnote are inserted between the two existing paragraphs:

    In his petition for rehearing, Hernandez argues for the first time that even if he was the inmate in blue identified in the channel 5 video, the riot was over when he interacted with Contreras. We have reviewed the video evidence and believe it sufficient for a reasonable person to conclude that the riot had not fully ended when the conduct at issue occurred.

4.  On page 23, after the first sentence of the paragraph added by modification No. 3 of this order, add as footnote 15 the following footnote, which will require renumbering of the subsequent footnote:

    [15] Hernandez claims he made this argument in his supplemental brief, but we do not read that brief as having clearly set forth this argument.

5.  On page 23, the last sentence in footnote 14 beginning, "The People argued below and on appeal that Hernandez participated in a riot or . . . ." is replaced with:

    The People introduced video evidence and testimony from Officer Contreras at the preliminary hearing and argued below and on appeal that Hernandez participated in the riot and was responsible for the natural and probable consequences thereof. In their motion to reinstate below, the People specifically argued that Hernandez lunged at an officer and took a bladed stance towards him, and, in their appellate briefing, the People again argued that Hernandez was seen threatening an officer after being told to get down.

There is no change in judgment.

The petitions for rehearing are denied.

Date: _____        _____ P. J.

2

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>EDGAR ABELINO et al.,<br><br>        Defendants and Respondents. | A159088<br><br>(Del Norte County<br>Super. Ct. No. CRPB195062) |

A riot occurred at Pelican Bay State Prison in which several correctional officers were seriously injured. The People charged defendants with torture (Penal Code[1], § 206), mayhem (§ 203), assault by a state prisoner (§ 4501, subdivision (b)), and battery by a state prisoner on a nonprisoner (§ 4501.5). At the preliminary hearing, the magistrate dismissed the complaint, and the trial court denied the People's motion to reinstate the complaint under section 871.5. The People appeal, seeking to reinstate the complaint with all but the torture counts. We reverse the superior court's order denying the People's motion to reinstate counts 5 through 17 of the complaint against defendants.[2]

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] Because the People do not seek to reinstate the torture charges, we do not address any arguments relating to counts 1 through 4.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. *The Charges*

The Del Norte County District Attorney filed a felony complaint charging defendants Edgar Abelino, Issajan Osman, Francisco Hernandez, and David Tagaban with torture (§ 206, counts 1–4); four counts of mayhem, naming officers Daniel Mount, Sergio Chavez, Paul Hicks, and Dale McDonald as victims (§ 203, counts 5–8); eight counts of assault by a state prisoner by means of force likely to produce great bodily injury naming officers Hicks, Mount, McDonald, Chavez, Anival Avila, John Franz, Zackery McCully, and Travis Molina as victims (§ 4501, subd. (b), counts 9–16); and battery by a state prisoner on nonprisoner, John Franz (§ 4501.5, count 17). The complaint alleged that all defendants had suffered prior serious felony and strike convictions pursuant to section 667, subdivisions (a), and (b) through (i).

## B. *Testimony from the Preliminary Hearing*

Two inmates at Pelican Bay State Prison, a prison with the highest level 4 security classification, got into a fight in prison yard 3, which is in front of 5 block. Some of the correctional officers responding to the fight used batons and O.C. grenades to try to break up the fight, and another officer working at an observation post, Officer Brewer, shot a 40-millimeter round at one of the combatants and hit his leg. When the fight was happening, the other inmates in the yards were ordered to a prone position.

After the fight between the two inmates ended, many inmates got to their feet and rushed the officers. Inmates attacked officers near the vehicle gate between yards 2 and 3 and prevented officers from closing

2

the gate. Officer Featherstone, who was outside walking toward yard 5 when the initial inmate fight broke out and who responded to the subsequent riot, testified that he saw 40 to 50 inmates get on their feet from yards 1 and 2 and run to yard 3. He further testified that the "Southerners"[3] in front of 5 block also got up and rushed officers, some of whom were attempting to close the vehicle gate. Featherstone testified that he knew the inmates who got up from 5 block were Southerners because inmates with certain gang affiliations hang out in specific areas, and the area where the movement came from was the Southerners' area. During the riot, Featherstone observed inmates attack officers and heard an inmate aggressively yelling, "Get him. Kill them." Featherstone testified that some inmates in the yard never got up. Video of the incident taken by four cameras on the prison yards and at the observation post showed that some inmates remained prone.[4]

Numerous officers were injured by unidentified inmates, including officers Franz, Hicks, Molina, Chavez, Avila, McDonald, McCully, and Sergeant Mount.[5] The officers were attacked by multiple

---

[3] Officers described "Southerners" to be a group of prisoners, most but not all Southern Hispanic, associated with the validated gang of the Mexican Mafia.

[4] The video came from what the officers referred to as channels 3, 5, 6, and 9. The channel 3 camera was pointed at yard 2, the channel 5 camera was pointed at most of yards 3 and 4, the channel 6 camera was pointed at a part of yard 3 near the urinals, and the channel 9 camera was at the observation post and captured the initial fight and the subsequent riot.

[5] The injured officers did not testify at the preliminary hearing. Instead, testimony came from investigating officers who interviewed the victims and officers who responded to the incident.

inmates who used their fists and feet, and there were upwards of 10 inmates to each officer. From his observation post, Officer Brewer saw numerous inmates attacking an officer; he shot a 40-millimeter round at one inmate, hitting him in the chest, and he then shot another 40-millimeter round and struck another inmate who fled the area after being shot. Officer Hicks was surrounded by inmates who pushed him to the ground and repeatedly punched and kicked him, and he thought he was going to die. He lost consciousness and was dragged to the safety of a small concrete yard by other officers. Officer Chavez was struck in the face by an inmate and suffered a broken nose. He was punched and kicked after he fell to the ground. Officer Franz was struck in the face as well. Sergeant Mount was swarmed by inmates and pinned against a fence. He hung on to the fence and was repeatedly punched all over his body; he believed he would have been killed if he had fallen to the ground. Officer McDonald was struck on the side of his head when he attempted to help Sergeant Mount, and he floated in and out of consciousness thereafter. Multiple inmates attacked Officer McCully, who was also struck in the head and suffered an injury to his head that required stitches. Officer Avila was hit from behind while trying to close a vehicle gate. Officer Molina was attacked by several inmates and believed that his life was in danger. Some

officers suffered permanent injuries, and several did not anticipate returning to work because of their injuries.[6]

Special Agent Geivett and Officer Bolden investigated the use of deadly force by officers during the riot. Officers shot a total of 20 shots from mini-14 rifles during the incident. Five of the 20 were "for effect," meaning the officer firing the shot intended to hit an inmate, and the remaining 15 were warning shots. Officer Vick, who was working in the building 6 observation post at the time of the riot, discharged four of the five "for effect" shots.[7] Each time, he aimed for the center mass, or the large portion of the upper body, of an inmate who was attacking officers, and he believed his shots impacted. Officer Hendrix, who was working in the observation post for the facility B yard, discharged the fifth "for effect" shot. He observed inmates attacking an officer in yard 3 who was hanging onto the fence, and Hendrix believed that if the officer went down, he would be killed. Hendrix fired one shot at the

---

[6] The alleged victims of the mayhem charges were officers Mount, Chavez, Hicks, and McDonald. Mount suffered a torn tendon and severe damage to his left arm, rendering it virtually useless. Chavez suffered concussions and pain and numbness in his right arm and hand that affects his grip strength and ability to do simple chores and hold a gun. Hicks had herniated disks in his neck; he suffered a puncture wound on his right elbow that caused a laceration to one of the nerves or tendons, leaving him with little use of his right arm. McDonald tore his meniscus and will require a knee replacement; he tore his rotator cuff and cannot fully raise his right arm; he also had metal plates put in his face to remedy shattered face bones. Defendants do not contend there was insufficient evidence that mayhem occurred, but they contend the identities of the perpetrators of the mayhem are unknown.

[7] Officer Vick remembered firing three shots, but the investigation uncovered another casing and determined that Vick fired a total of four shots.

group of ten or more inmates attacking that officer, and he believed he hit an inmate in the upper body. After that, Hendrix discharged only warning shots for fear of hitting the officers being attacked. Of the warning shots, Officer Hendrix fired 13 and Officer Gonzalez, who was working in the observation post for facility 3, fired two.[8] Hendrix fired his warning shots into the ground in front of his post, as did Gonzalez. Investigative officers inspected the ground where these warning shots impacted and observed 13 holes where Hendrix fired and two where Gonzalez fired. All of the "for effect" shots were discharged in yard 3, and Geivett testified that there were five inmates with bullet wounds. Officers who responded to the incident testified that, after the incident was over, inmates on both yards 2 and 3 were found with gunshot wounds.

During the riot, video captured an inmate in yard 3 in a blue shirt getting into the prone position with his body facing away from the vehicle gate between yards 2 and 3.[9] The inmate turns himself around to face the vehicle gate and moves as if to get up but resumes the prone position. Then, the inmate gets up and starts running in the direction

---

[8] Agent Geivett confirmed that Officers Hendrix, Vick, and Gonzalez were all gunners.

[9] Prior to getting into the prone position, this inmate is seen coming into the channel 5 video recording behind an inmate in white who appears to knock over an officer. The parties describe the inmate in blue as being involved in a fight with another inmate, presumably the one in white, when he appears on the video recording; it is not clear from the video, however, that the inmates were involved in a fight. In any event, the nature of the interaction between these two inmates is irrelevant to our disposition, as the relevant action takes place approximately 30 seconds later when the inmate in the blue shirt gets up from his prone position, after the inmate in white is no longer visible on the recording.

of the vehicle gate. An officer appears in the inmate's path and extends his arm, and, after a couple of seconds, the inmate gets down and later appears to be handcuffed in the spot where he got down. Officer Contreras, who identified video of the interaction and identified himself as the officer who appeared in the inmate's path, testified that he later identified the inmate as Hernandez by his position on yard 3 through photographs that were taken of the inmates' positions on the yard, and that he obtained Hernandez's inmate number after reviewing the photographs from yard 3.[10] Contreras testified that Hernandez got up from the ground to lunge toward him, and he did not get down until Contreras took out his baton and ordered him down twice. Hernandez was about 15 to 20 feet from the location of the original incident when he encountered Contreras.

Once the riot was under control, the vehicle gate was locked, the inmates were handcuffed, and placement photographs were taken. Inmates were then photographed in the yard where they were found with their prison identification card or placards with handwritten names if they did not have their card. Only inmates found in yard 3 were photographed in yard 3. Defendants Abelino, Osman, and Hernandez were photographed in yard 3. The magistrate reviewed the admitted inmate photographs and identified Abelino, Osman, and Hernandez as the individuals in the photographs. Abelino's shorts and

---

[10] There were two other inmates with the surname Hernandez located on the yards after the riot and identified in the report that Contreras composed on the day of the incident. However, the other two, whom Contreras identified in his report by differing "last two" numbers (seemingly their prison identification numbers), were on yard 2.

7

socks had blood spatter on them, but the blood was not sent out for testing. Osman's left forearm had a red mark that Officer Burr, one of the officers who investigated the incident, opined was consistent with being hit by a 40-millimeter launcher, or an exact impact round. Defendant Tagaban was located on yard 3, and officers escorted to him the clinic because he had a gunshot wound in his bicep. He was identified by a testifying officer who had worked in the unit where Tagaban was housed and who had helped escort Tagaban off yard 3. Tagaban was transported to the hospital, and photographs of him from the hospital show his knees scuffed and bloody.

There were only two possible weapons found among the inmates—a rolled-up soda can and a piece of plastic. Officer Zach Basnett, who worked for the investigative services unit, spoke to two confidential informants and received reports from three others about the incident. From these informants, Basnett learned that the incident involved Southern Hispanic gang members who responded to the perception that officers were using excessive force against the two initial combatants. Basnett's source told him the incident was unplanned, and, based on his investigation, Basnett testified that his source's statement seemed accurate.

## C. Dismissal of the Charges

After testimony, the People argued that defendants participated in a prison riot and the natural and probable consequences of such a riot were torture, mayhem, battery, and assault. Counsel for various defendants argued that the evidence showed only that defendants were in the yard, not that they committed any crime.

Tagaban's counsel argued specifically that there was no evidence of torture, and the evidence showed that the inmates acted to stop the use of excessive force. He conceded there was evidence of mayhem, but he stated there was no evidence before the court of what defendants actually did or that defendants touched the officers. He argued that not every inmate found in the yards participated in the riot, specifically mentioning video showing four or five men who remained prone. Tagaban's counsel then rhetorically asked whether those men were his client or the other defendants. The magistrate responded, "Well, you know, the—you argue the gunshot thing could have been accident. I would think much more logically he was—got—was involved in something and got shot. I think that's a much more logical reading of that injury. And the blood on the other people. They were in the—they were not lying on the ground. They were involved in something. But—so . . . [¶] But your other arguments are, I think, better."

The magistrate went on to reject the defense of others argument, finding that "they are way beyond defense of others . . . because the [initial] fight was over with. Those guys were done. It was over with. Once they got up, they had—there's no way that they can claim defense of others." Tagaban's counsel interjected and stated that the men who beat the officers should be punished, but questioned, "Who are they?" The magistrate responded, "I'm getting to that. [¶] And so I can't tell who—I can't tell who was actually involved in the assault except, unfortunately as to your client, I think I can very reasonably infer. But the question is the crimes—I think your argument on torture is good. I have a hard time finding the occurrence of torture in there. [¶] They did cause mayhem though. These guys were—as Officer Pena was

9

describing, they are serious injuries, real serious injuries.  Many of them are no longer going to be able to be in law enforcement. [¶] Anyway, this is a tough one.  Yeah. [¶] . . . [¶] I want to hear another round because I'm—and if I'm to that point where I'm having that much trouble, I'm not really comfortable saying, yeah."

Hernandez's counsel then conceded that Hernandez was guilty of misdemeanor delaying an officer.  Tagaban's attorney addressed the magistrate's earlier referenced inference and argued that the officers who fired shots were likely to have fired and "drop[ped]" inmates who were not near the victim officers.  The magistrate responded, "Well, or let's not drop anybody.  They shot 20 shots, 15 of them into the ground." He then concluded, "Yeah.  I'm not comfortable binding the case over. I'm finding that there isn't sufficient cause to believe—[¶] . . . [¶] I don't believe there's sufficient cause to believe that the crime of torture—that the crime of torture—there may be some evidence of the crime of mayhem.  But I don't think that these defendants are tied in. [¶] And so I'm going to determine that the Counts 1 through 8 as to all the defendants are dismissed, and the defendants are discharged."  Defense counsel asked the court about counts 9 through 17, and the prosecutor confirmed that for these counts, "it's the same theory.  Everything is the same theory.  Participate in a riot, you're guilty for what happens. I'm just looking for an order."  The magistrate concluded, "I'm going to have the same order.  I'm not going to find that either."

## D. The Reinstatement Motion

The People moved to reinstate the complaint under section 871.5. The court affirmed the magistrate's dismissal, finding the record was devoid of evidence that the defendants did any specific thing.  "Viewed

as a whole, the prosecution is relying on a tumultuous, riotous situation coupled with proof of correctional officer injuries to have us draw the inference that these four defendants actually committed certain specific crimes." The court found that the magistrate made an "affirmative finding of fact that there's nothing sufficiently persuasive that he believes to tie the defendants in with the commission of any of the charged crimes." The People appealed.

## II.    DISCUSSION

The prosecution seeks to hold defendants liable for the commission of mayhem, assault by a state prisoner, and battery by a state prisoner on a nonprisoner (the nontarget offenses) based on the theory that defendants participated in, or aided and abetted, a riot at Pelican Bay (the target offense), and defendants are liable for the nontarget offenses because the nontarget offenses are natural and probable consequences of commission of the target offense. We thus embark upon two distinct inquiries in this appeal: first, was there sufficient cause to believe that defendants participated in, or aided and abetted, a prison riot; and second, would a reasonable person in defendants' positions know that the commission of mayhem, assault by a state prisoner by means of force likely to produce great bodily injury, and battery by a state prisoner on a nonprisoner were the natural and probable consequences of the riot.

### A. Standard of Review

A magistrate's function at a felony preliminary hearing is to determine whether there is "sufficient cause" to believe defendant guilty of the charged offense. (§§ 871, 872, subd. (a).) "Sufficient cause" means " 'reasonable and probable cause' " or "a state of facts as would

lead a [person] of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused." (*People v. Uhlemann* (1973) 9 Cal.3d 662, 667; *People v. Slaughter* (1984) 35 Cal.3d 629, 636 (*Slaughter*).)  It is "a level of proof below that of proof beyond a reasonable doubt, or even proof by a preponderance of the evidence." (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1189.)  In determining whether there is probable cause, the magistrate may "weigh the evidence, resolve conflicts, and give or withhold credence to particular witnesses." (*Uhlemann*, at p. 667.)  "A charge will not be dismissed for lack of probable cause 'if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.' " (*People v. Superior Court (Day)* (1985) 174 Cal.App.3d 1008, 1020 (*Day*).)  It is well settled that "the showing required at a preliminary hearing is exceedingly low." (*Salazar v. Superior Court* (2000) 83 Cal.App.4th 840, 846.)

"When an action is dismissed by a magistrate pursuant to Section 859b, 861, 871, 1008, 1381, 1381.5, 1385, 1387, or 1389 of this code, . . . or a portion thereof is dismissed pursuant to those same sections which may not be charged by information under Section 739, the prosecutor may make a motion . . . to compel the magistrate to reinstate the complaint or a portion thereof and to reinstate the custodial status of the defendant under the same terms and conditions as when the defendant last appeared before the magistrate." (§ 871.5, subd. (a).)  However, the prosecution may only seek reinstatement on the basis that "as a matter of law, the magistrate erroneously dismissed the action or a portion thereof." (§ 871.5, subd. (b).)

On appeal following a superior court's order denying a motion to reinstate a complaint under section 871.5, we disregard the superior court's ruling and examine only the magistrate's ruling. (*People v. Massey* (2000) 79 Cal.App.4th 204, 210.) Our Supreme Court in *Slaughter* set forth the standard of review of the magistrate's ruling. (*Slaughter*, *supra*, 35 Cal.3d at p. 642.) The character of our review depends on whether the magistrate has exercised the power to render findings of fact. (*Id.* at p. 638.) If the magistrate makes factual findings, those findings are conclusive if supported by substantial evidence. (*Ibid.*) "If he has not rendered findings, however, the reviewing court cannot assume that he has resolved factual disputes or passed upon the credibility of witnesses. A dismissal unsupported by findings therefore receives the independent scrutiny appropriate for review of questions of law." (*Ibid.*) "[I]f the magistrate dismisses a charge when the evidence provides a rational ground for believing that defendant is guilty of the offense, his ruling is erroneous as a matter of law, and will not be sustained by the reviewing court." (*Id.* at pp. 639–640, italics omitted.)

Preliminarily, the parties dispute whether the magistrate made a factual finding or rendered a legal conclusion. The following statement is the subject of debate: "I don't believe there's sufficient cause to believe that the crime of torture—that the crime of torture—there may be some evidence of the crime of mayhem. But I don't think that these defendants are tied in." The People contend that the magistrate erroneously concluded that defendants could not be legally liable for the nontarget offenses absent evidence that specifically proved each of them attacked one of the victims, or that he rendered a strictly legal

conclusion that the evidence was insufficient to show that defendants participated in the riot. Defendants Abelino, Osman, and Hernandez contend that, in stating, "I don't think these defendants are tied in," the magistrate made a controlling finding of fact that defendants did not participate in the riot. Because the dispute over whether the magistrate made a factual finding affects our standard of review, we address it first.

*Jones v. Superior Court* (1971) 4 Cal.3d 660 (*Jones*), provides the seminal example of a case where express factual findings precluded further prosecution of a charge dismissed at the preliminary hearing.[11] There, the defendants had been charged with rape, oral copulation, and sodomy. (*Id.* at p. 663.) The victim and the defendants testified to two different versions of events at the preliminary hearing. (*Ibid.*) The magistrate stated his opinion that the victim had not told the truth. (*Id.* at pp. 663–664.) He found that neither the sodomy nor the oral copulation had taken place, the victim had consented to sexual intercourse with defendants, and he held the defendants to answer for statutory rape. (*Ibid.*) The district attorney filed an information charging the original offenses, and the testimony of the victim, if believed, would have supported a conviction for all the offenses. (*Id.* at

---

[11] *Jones* reviewed an order denying the defendant's motion under section 995 to dismiss an information following the prosecution's election under section 739 to refile the information including charges dismissed at the preliminary hearing where the defendant had been held to answer on a transactionally related charge (section 739 review). (*Jones, supra,* 4 Cal.3d at p. 664.) *Slaughter* adopted the standard for section 739 review for cases under section 871.5 and relied on section 739 authorities explaining when a magistrate has made a finding of fact. (*Slaughter, supra,* 35 Cal.3d at p. 642.)

14

pp. 664–666.)  However, the Supreme Court held that the magistrate's factual findings disbelieving the victim prohibited the refiling of the rape, oral copulation, and sodomy charges.  (*Id.* at p. 666.)

After *Jones*, courts have observed that determining whether the magistrate made a prohibitive factual finding is not always clear-cut, and *Jones* did not provide "guidelines for the interpretation of magisterial remarks."  (*Day*, *supra*, 174 Cal.App.3d at p. 1016.)  *"Jones'* distinction between a factual finding and a legal conclusion is clear enough in the abstract but has posed some difficulty in its practical implementation.  Experience has demonstrated that it is not always easy to apply a strip of appellate litmus to a magistrate's record remarks and distinguish between evidentiary evaluation and factual determination."  (*Id.* at pp. 1015–1016.)  Often, "the magistrate's remarks leave considerable room for interpretation, as is often true of the impromptu statements of lawyers and judges."  (*Dudley v. Superior Court* (1974) 36 Cal.App.3d 977, 981 (*Dudley*).)  In this case, where the magistrate neither expressed disbelief of an essential witness, nor recited specific findings of fact with talismanic reference to *Jones*, we find a series of appellate decisions instructive.

In *Dudley*, the evidence showed that the defendant had beaten the victim who died of a brain hemorrhage.  However, the death occurred only because of a preexisting aneurysm of which the defendant was unaware.  (*Dudley*, *supra*, 36 Cal.App.3d at p. 979.)  The complaint charged murder, and after the preliminary hearing, the magistrate held the defendant to answer for involuntary manslaughter, saying, "I did not think this was murder[,] . . . I think it requires a great deal more proximate cause and the actual cause of death when

15

you are dealing with a pre-existing condition[,]" and "[t]here is no evidence [of] . . . either expressed or implied malice."[12] (*Id.* at pp. 978– 979, 980.) The superior court denied the defendant's section 995 motion after the prosecutor refiled an information charging murder. (*Id.* at p. 979.)

The appellate court denied the defendant's request for a writ requiring that the information be amended to charge manslaughter instead of murder. (*Dudley*, *supra*, 36 Cal.App.3d at p. 985.) The court observed that it was not clear whether the magistrate made a factual finding: portions of his statements suggested that he believed a stronger showing of causation was required for murder than for manslaughter, or that the offense would not be murder where the

---

[12] The magistrate's full statement was: " '[The defendant] in this case must foresee that the individual he picks is suffering from a pre-existing condition, and if he gets in a fight with him, he might die. [¶] 'That is why I said in the beginning, and what I meant to say, in trying to guide Counsel during the course of the evidence that I did not think this was murder. I said that it was homicide. I meant murder because the murder case requires showing malice. I think it requires a great deal more proximate cause and the actual cause of death when you are dealing with a pre-existing condition. [¶] . . . [¶] 'There is no question that the evidence does not (sic) disclose combative situation, such as was described in this case by the witnesses, and by the autopsy surgeon's findings, which did not disclose any evidence of abandoned malignant heart. [¶] 'There has to be expressed malice or implied malice for it to be murder. There is no evidence there from which the Court can conclude, either expressed or implied malice existed in this case. [¶] . . . [¶] 'I think the man should be charged with involuntary manslaughter. I think it is a one-sided fight. I think he took advantage when [the victim] was down, but I do not believe that those circumstances in the light of the autopsy surgeon's findings that they were moderate external injuries and do not show abandon and malignant heart.' " (*Dudley*, *supra*, 36 Cal.App.3d at pp. 979–980.)

16

assailant was unaware of the victim's pre-existing condition, whereas other portions might be read to express the view that the evidence was insufficient to support a finding of malice. (*Id.* at p. 981.) The court started the task of interpreting the magistrate's statements with the observation that, on the record before it, malice could be arrived at only by drawing inferences from mostly undisputed facts. (*Id.* at p. 982.) No showing was made that the magistrate disbelieved the testimony presented by the prosecution. (*Id.* at p. 985.) Ultimately, the court concluded that the magistrate did not make a factual finding. (*Ibid.*) Instead, what the magistrate did is draw "inferences from the proven facts, which indicated to his mind that there was no malice, even though these same evidentiary facts would have supported a finding of malice in the mind of another reasonable person." (*Id.* at p. 982.) The court reversed the magistrate's legal error because "[t]he unimpeached, credible evidence received at the preliminary examination supports an inference of malice and gives probable cause to try petitioner for murder, but the magistrate acted upon his personal opinion that the offense was no more than manslaughter." (*Id.* at p. 985.)

In *People v. Superior Court* (*Gibson*) (1980) 101 Cal.App.3d 551, 553–554, the trial court granted the defendant's motion under section 995, finding that the magistrate's factual findings precluded prosecution of a kidnapping charge and "special circumstance" allegations for first degree murder. The appellate court characterized the magistrate's ruling as "a mixture of suggestions about [the magistrate's] factual findings and statements about his conclusions concerning reasonable cause," including comments on the believability of two unnamed witnesses. (*Ibid.*) The appellate court found that the

17

trial court had "attempted to guess which witnesses the magistrate found doubtful, and having made its guess felt bound by the magistrate's findings." (*Id.* at p. 554.) "[W]here guesswork is required to determine what the magistrate found, there is no finding worthy of the deference required by the *Jones* decision." (*Ibid.*) Thus, the court instructed the trial court to reconsider the motion without regard to the purported "findings" of the magistrate. (*Id.* at p. 555; accord *Day*, *supra*, 174 Cal.App.3d at pp. 1018–1019 [rejecting the trial court's conclusion that the magistrate made an implied factual finding that the defendant killed without malice where that conclusion was a result of guesswork and the magistrate made no express factual finding].)

We conclude that the magistrate here did not make a factual finding. He did not specify that he was making a factual finding that defendants remained on the ground during the riot or that they did not participate therein. To the contrary, at least with respect to defendants Tagaban, who had a gunshot wound, and Osman, who had blood on his clothing, the magistrate commented that a more logical reading of the evidence was that they were "involved" in the assault on the officers or "in something." Not long after those comments and directly after stating that he "did not believe there was sufficient cause to believe that the crime of torture" was committed, the magistrate said that, while there was some evidence of mayhem, he "[didn't] think that these defendants are tied in." There is some ambiguity to the magistrate's statement, but a "factual finding fatal to a criminal allegation, which prevents the prosecution from even filing the charge, should not be established by guesswork." (*Day*, *supra*, 174 Cal.App.3d at p. 1019.) There is no showing that the magistrate disbelieved or disregarded any

18

of the People's evidence, and the evidence was largely undisputed. On this record, then, we believe the magistrate accepted the proffered evidence, but determined there was insufficient evidentiary support for a finding that defendants committed mayhem. This was a legal conclusion.

Indeed, as defendants concede that the magistrate's ruling "might have been more detailed," they impliedly concede its ambiguity. Citing *People v. Massey*, *supra*, 79 Cal.App.4th at page 210, defendants nonetheless state that, to the extent that the ruling leaves room for argument, "[this court], like the superior court, must draw every legitimate inference in favor of the magistrate's ruling and cannot substitute our judgment, on the credibility or weight of the evidence, for that of the magistrate." The rule that defendants cite represents the standard if the magistrate made factual findings. (*Massey*, at p. 210 ["To the extent the magistrate's decision rests upon factual findings, '[w]e . . . must draw every legitimate inference in favor of the magistrate's ruling and cannot substitute our judgment, on the credibility or weight of the evidence, for that of the magistrate' "].) That standard does not govern our assessment of whether the magistrate actually made factual findings. In this case, we review the magistrate's legal determination de novo. (*Slaughter*, *supra*, 35 Cal.3d at p. 638.)

## B. Sufficient Cause Exists to Believe Defendants Participated in a Riot

Participation in a riot is a criminal offense. (§ 405.) "Any use of force or violence, disturbing the public peace, or any threat to use force or violence, if accompanied by immediate power of execution, by two or

19

more persons acting together, and without authority of law, is a riot."
(§ 404, subd. (a).) "[D]isturbing the public peace may occur in any place of confinement," including a state prison. (§ 404, subd. (b).) "It [is] not necessary that a previous agreement between the aggressors should have been alleged, or have existed, to bring such offenses within the inhibitions of section 404." (*People v. Bundte* (1948) 87 Cal.App.2d 735, 743 (*Bundte*).) "[I]t is the concurrence of unlawful action by individuals in the use, or threat to unlawfully use force or violence that constitutes the offense of riot." (*People v. Cipriani* (1971) 18 Cal.App.3d 299, 304, italics omitted.) The law prohibiting riots is based on the need to prevent the combined effect of concurring violent acts, not conspiracy. (*Id.* at pp. 306–307 [affirming a riot conviction where the concurrence of the defendant's act of throwing rocks at national guardsmen with the actions of other persons who were participating in a generalized riot in a specific location, as well as defendant's knowledge of that concurrence, was clearly inferable from the circumstances].) All persons who encourage, incite, promote, give support to or countenance a riot are principals in a riot. (*Bundte*, at p. 746.)

"A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) Neither mere presence at the scene of a crime, nor the failure to take steps to prevent a crime, is alone enough to establish that a person is an aider and abettor. Such evidence may, however, be considered together with other evidence in

determining that a person is an aider and abettor.  (*Pinell v. Superior Court* (1965) 232 Cal.App.2d 284, 287.)

We thus inquire whether there is " 'some rational ground for assuming the possibility that [the offense of rioting] has been committed and the accused is guilty of it.' " (*Day*, *supra*, 174 Cal.App.3d at p. 1020.)  Given the testimony and video evidence, there is clearly is a rational ground for assuming the possibility that a riot occurred at Pelican Bay.  We turn then to whether there is some rational ground for assuming defendants are guilty of participating in the riot.

The evidence gives rise to a strong suspicion that defendant Tagaban participated in the "use of force or violence, disturbing the public peace, or [a] threat to use force or violence, . . . accompanied by immediate power of execution," along with other inmates and without authority of law.  (§ 404.)  After the riot ended, Tagaban was escorted from yard 3 to the clinic with a bullet wound in his bicep.  Officers fired only five "for effect" shots during the riot, and they fired these shots in yard 3.  The two officers who fired the "for effect" shots aimed at inmates attacking officers, and each believed his shots impacted.  After the riot was over, five inmates had bullet wounds.  Investigative officers verified that the 15 warning shots fired during the riot were fired into the ground in front of observation posts.  Further, photographs of Tagaban from the hospital where he was taken for treatment after the riot showed that his knees were bloody and scraped.  Tagaban argues that, if he acted, he did so in defense of others, but we reject his argument because the magistrate's finding

21

that the initial inmate fight was over when the inmates rose to riot is supported by substantial evidence.[13]

Regarding Hernandez, Officer Contreras testified that an inmate got up from a prone position to lunge toward him. The inmate did not get back down until Contreras took out his baton and ordered him down twice. Contreras identified video from the yard capturing his interaction with the inmate. That same video shows that, before his interaction with Contreras, the inmate came into the video recording on foot from the right and subsequently got into the prone position with his body facing away from the vehicle gate between yards 2 and 3. He turned himself around to face the vehicle gate and moved as if to get up. Then, about 20 seconds later, he got up and started running toward the vehicle gate. An officer appeared in the inmate's path and extended his arm, stopping the inmate's movement, and, after a couple of seconds, the inmate got back down, and later appeared to be handcuffed in the spot where he got down. Contreras confirmed that he was the officer in the inmate's path on the video, and he later identified the inmate as Hernandez by his position on yard 3 through photographs that were taken of the inmates' positions and Hernandez's prison identification number, which he obtained after reviewing the photographs. Hernandez was 15 to 20 feet from the location of the original incident. This evidence supports a reasonable suspicion that

---

[13] Among other things, the doctrine of "defense of another" requires the defendant to have reasonably believed that a third party was in imminent danger of suffering bodily injury or of being touched unlawfully and to have reasonably believed that the immediate use of force was necessary to defend against that danger. (CALCRIM No. 3470.)

Hernandez acted with the threat to use force or violence, accompanied by immediate power of execution, while knowing other inmates were unlawfully rioting and attacking guards. It similarly supports a reasonable suspicion that Hernandez knew the other inmates were rioting and attacking officers, intended to commit, encourage, or facilitate the crime of rioting, and, by the act of threateningly moving toward Contreras, aided the commission of the riot.[14]

Finally, we also find the evidence establishes a state of facts that would lead a person of ordinary caution to entertain a "strong suspicion" that defendants Abelino and Osman participated in, or aided and abetted, the riot. The inmates were photographed along with their prison identification cards in the yard in which they were located when the riot ended, and Abelino and Osman were photographed in yard 3. Defendants accurately argue that presence at the scene alone does not support a reasonable suspicion that they participated in the riot (*Bundte, supra*, 87 Cal.App.2d at p. 746), but here there is more than mere presence. All inmates were ordered to get down during the initial fight and during the riot. Yet, after the riot, Abelino had blood on his sock and "obvious blood splatter" on his shorts, and Osman had a "slashing" mark with a circular-shaped welt on his left arm consistent

---

[14] In light of this conclusion, we need not address Hernandez's claim that the People improperly raised new theories of guilt—that Hernandez is liable because the charged crimes are natural and probable consequences of the crime of misdemeanor delaying an officer or because Hernandez directly aided and abetted the charged crimes by committing misdemeanor delaying an officer—for the first time on appeal in their reply brief. The People argued below and on appeal that Hernandez participated in a riot or aided and abetted that crime and specifically argued that Hernandez lunged at an officer, and was seen threatening and delaying that officer, after being told to get down.

with being hit by a 40-millimeter exact impact round.  The riot involved attacks on officers in a specific area near the vehicle gate between yards 2 and 3, and, while the video from the prison yard of the riot is not in high definition, it does not show inmates close to the vehicle gate at issue remaining in prone positions throughout the entire riot.  Thus, the physical evidence pertaining to Osman and Abelino is enough to provide a rational ground to assume the possibility that they are guilty of participating in the riot.  While this evidence might not establish guilt beyond a reasonable doubt, the standard of sufficient cause is much lower.  (*Slaughter*, *supra*, 35 Cal.3d at p. 637; *Salazar v. Superior Court*, *supra*, 83 Cal.App.4th at p. 846 [prosecution's burden at a preliminary hearing is "exceedingly low"].)

### C. Natural and Probable Consequences

Defendants briefly, with no citation to authority, argue that mayhem, assault by a state prisoner by means of force likely to produce great bodily injury, and battery are not natural and probable consequences of the riot that occurred.  As set forth below, in the circumstances of this case, we disagree.

Under the natural and probable consequences doctrine, one " 'who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime.' " (*People v. Medina* (2009) 46 Cal.4th 913, 920.)  A perpetrator of the target crime is similarly liable for any crime committed by another principal that is the natural and probable consequence of the target crime.  (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1376 [perpetrator of an assault involving gang

24

members held liable under the natural and probable consequences doctrine when a co-participant shot the victim].)

"Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' " (*People v. Medina, supra,* 46 Cal.4th at p. 920.) "A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury. " (*Ibid.*) The "question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable." (*Ibid.*) " '[T]o be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. " ' " (*Ibid.*)

In this case, the evidence was sufficient to entertain a reasonable suspicion that defendants committed the target crime of rioting in the yard of a maximum-security prison and that, taken as a whole, the riot involved the use of force or violence by numerous inmates against correctional officers who were significantly outnumbered. A person "who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless . . . is guilty of mayhem." (§ 203.) Section 4501.5 prohibits a prisoner from willfully touching a nonprisoner in a harmful or offensive manner. (CALCRIM No. 2723.) Section 4501, subdivision (b) prohibits assault by a prisoner "by any means of force likely to produce great bodily injury," and, in discussing similar statutory language, our Supreme Court has noted

25

that it is well established that "the use of hands or fists alone may support a conviction of assault 'by means of force likely to produce great bodily injury.'" (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028 [discussing section 245, subd. (a)].)[15]  Given the particular circumstances of this prison riot and the scope of force and violence used, a person of ordinary prudence could have entertained a reasonable suspicion that mayhem, battery, and assault by means of force likely to produce great bodily injury were reasonably foreseeable, and hence natural and probable, consequences of the target crime of riot.  Taking into account the "exceedingly low" standard of proof at a preliminary hearing (*Salazar v. Superior Court*, *supra*, 83 Cal.App.4th at p. 846), the testimony and video evidence in this case provide a " 'rational ground for assuming the possibility that an offense has been committed' " and that the defendants are guilty.  (*Day*, *supra*, 174 Cal.App.3d at p. 1020.)  At this stage of the criminal proceedings, no more is required.

---

[15] Subdivision (b) of section 4501 states in full, "Except as provided in Section 4500, every person confined in the state prison of this state who commits an assault upon the person of another by any means of force likely to produce great bodily injury shall be guilty of a felony and shall be imprisoned in the state prison for two, four, or six years to be served consecutively."  Section 245, subdivision (a)(4) makes it a crime to commit "assault upon the person of another by any means of force likely to produce great bodily injury."  "The elements of the offenses set forth in sections 4501 and 245, subdivision (a), are identical in all respects except that section 4501 requires, as an additional element, that the defendant be a prisoner confined in a state prison." (*People v. Noah* (1971) 5 Cal.3d 469, 479 [discussing former sections 4501 and 245].)

## III.   DISPOSITION

The superior court's order denying the People's motion under section 871.5 to reinstate counts 5 through 17 of the complaint against each defendant is reversed.


BROWN, J.


WE CONCUR:

STREETER, ACTING P. J.
TUCHER, J.


*People v. Abelino et al.*  (A159088)

Trial Court:       Del Norte County Superior Court

Trial Judge:       Hon. Leonard J. LaCasse

Counsel:

Xavier Becerra, Attorney General, Lance E. Winters and Jeffrey M. Laurence, Assistant Attorneys General, Seth K. Schalt and Bridget Billeter, Deputy Attorneys General, for Plaintiff and Appellant.

Eric Weaver, under appointment by the Court of Appeal, for Defendant and Respondent Edgar Abelino.

Gabriel Bassan, under appointment by the Court of Appeal, for Defendant and Respondent Francisco Hernandez.

Ross Thomas, under appointment by the Court of Appeal, for Defendant and Respondent Issajan Osman.

George M. Mavris, under appointment by the Court of Appeal, for Defendant and Respondent David Tagaban.