Filed 4/30/21  P. v. Molina CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B295701 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA143107) |
| v. | |
| DAVID MOLINA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Teresa P. Magno, Judge.  Affirmed as modified.

Stephen M. Vasil, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

A jury convicted David Molina (defendant) of the attempted premeditated murder of a person he believed to be a rival gang member.  On appeal, defendant argues that his conviction must be reversed because (1) one of the legal theories that supports his conviction is invalid, (2) the jury instructions were defective, and (3) there was insufficient evidence.  His arguments lack merit.  We therefore affirm, but order that defendant's date of birth be corrected in various court documents.

**FACTS AND PROCEDURAL BACKGROUND**

## I.     Facts

At just past noon on a Tuesday in January 2017, defendant, Jerome Hooks (Hooks) and Stephen Cuevas (Cuevas) accosted a man exiting a liquor store.

The encounter took place in territory controlled by the 89 Family Swans street gang.  Defendant, Hooks, and Cuevas are all members of that gang.  Cuevas is defendant's cousin, and is defendant's protégé in the gang; to reflect this relationship, defendant's moniker is "Big TK Bandit" and Cuevas's is "Lil TK Bandit."  During the incident, Cuevas was wearing a ballcap with a logo and in colors associated with the 89 Family Swans gang.

The incident in January 2017 started when defendant spotted a man he believed to be a member of a rival gang (the 7-Trey Crips) leaving a liquor store located within but at the edge of 89 Family Swans territory.  Defendant and Hooks started to follow the man as he walked down the sidewalk toward his parked car.  Cuevas joined defendant and Hooks in their approach momentarily, but then ducked into the liquor store and emerged holding his hand to his waistband and with the hood of his hoodie up.

2

As defendant, Hooks, and Cuevas caught up to the man, defendant started talking to the man. At first, the man ignored them but eventually turned to face them.

Defendant then stepped forward and squared off with the man as Hooks and Cuevas fanned out on either side of defendant in a semicircle around the man. Seconds later, defendant held out his arm to point at the man and Cuevas immediately thereafter pulled a revolver from his waistband and took aim at the man.

Upon seeing the gun, the man lunged toward Cuevas but defendant pulled him away. Cuevas fired a shot but the shot missed the man and shattered the glass door of a marijuana dispensary behind the melee. The man then grabbed defendant, and the two engaged in a pushing and shoving match with the man trying to keep defendant as a "shield" between himself and Cuevas.

Hooks then stepped forward and punched the man in the face. The man released defendant and then started to run down the street. As the man fled, Cuevas fired off a second shot. That shot also missed.

Defendant, Hooks, and Cuevas then ran away.

The following day, defendant was carrying a gun identical in "make and model" to the gun Cuevas used the day before; defendant was also with Hooks.

## II.    Procedural Background

### A.    *The charge and allegations*

The People charged defendant with a single count of willful, deliberate, and premeditated attempted murder (Pen. Code,

§§ 187, subd. (a), 664, subd. (a)).[1]  The People further alleged that (1) the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)(C)), and (2) a principal in the crime had personally and intentionally discharged a firearm (§ 12022.53, subds. (c) & (e)(1)).

### B.    *Evidence at trial*

The primary evidence at trial was surveillance video from the marijuana dispensary that showed the incident unfold from a variety of angles.  The video had no audio track.  An officer who had reviewed the video "several times" walked the jury through what was on the video, and offered still photographs from the video.

A gang expert familiar with the 89 Family Swans gang opined on street gang culture.  Among other things, the expert opined that (1) gangs are territorial and place great "importance" on "defend[ing]" their territory "from encroachment" by rival gang members; (2) "gangs are all about status and respect"; (3) a rival gang member's presence in another gang's territory is a "sign of disrespect"; (4) when members of rival gangs confront one another, there is a "high" "probability [of] violence," ranging from a "physical fight" to gunplay, such that "hav[ing] a gun" is an "absolute[] necess[ity]" if gang members are going "to confront a rival gang member"; and (5) gang members who are "going out to commit a crime together" "know [which of them] has a gun."

Because Cuevas was the shooter, the trial court instructed the jury that defendant could be convicted of the attempted premeditated murder on one of two theories:  (1) defendant aided

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

and abetted Cuevas in the crime of attempted murder (the direct aiding and abetting theory), or (2) defendant engaged in the crime of "fighting or challenging someone to fight," Cuevas aided and abetted defendant in that fight or challenge, and the attempted murder committed by Cuevas was a "natural and probable consequence" of that fight or challenge (the natural and probable consequences theory).

The jury found defendant guilty of attempted premeditated murder, and found true the gang and firearm allegations.

### C. *Posttrial motions, sentencing and appeal*

Defendant moved for a new trial on the ground that Senate Bill 1437 (2017-2018 Reg. Sess. (S.B. 1437)) retroactively abolished liability for attempted murder under a natural and probable consequences theory. The trial court denied the motion.

The trial court sentenced defendant to prison for seven years to life. In imposing this sentence, the court struck the gang enhancement and imposed but stayed the 20-year firearm enhancement.

Defendant filed this timely appeal.

### DISCUSSION

Defendant raises a plethora of challenges to his conviction, and those challenges can be grouped into three buckets—those challenging the legal validity of his conviction, those challenging the jury instructions, and those challenging the sufficiency of the evidence. He also challenges the accuracy of his date of birth recorded in several court documents.

## I. Legal Validity of the Conviction

Defendant argues that his conviction of attempted premeditated murder is legally invalid. He offers a two-step argument: (1) the jury instructions precluded the jury from

5

finding him guilty under a direct aiding and abetting theory, (2) he cannot be held liable for attempted premeditated murder on a natural and probable consequences theory because of (a) our Supreme Court's decision in *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), superseded by statute as stated in *People v. Gentile* (2020) 10 Cal.5th 830, 849, and (b) S.B. 1437.  The validity of a legal theory of liability as well as jury instructions are questions of law we review de novo.  (*People v. Waidla* (2000) 22 Cal.4th 690, 730; *People v. Mitchell* (2019) 7 Cal.5th 561, 579 (*Mitchell*).)

We reject the first step of defendant's argument.

Although the jury was instructed on both the direct aiding and abetting theory and the natural and probable consequences theory, defendant contends that the instructions precluded the jury from finding him guilty on a direct aiding and abetting theory because (1) the introductory sentence of the natural and probable consequences theory instruction stated, "Before you may decide whether the defendant is guilty of *attempted murder*, *you must decide whether he is guilty of fighting or challenging someone to fight*" (italics added), and the seemingly absolute nature of this command precluded the jury from also considering whether defendant directly aided and abetted Cuevas in committing attempted premeditated murder, and (2) the verdict form used the words "malice aforethought" when no jury instruction used those words.

Defendant's arguments lack merit.

To us, the highlighted language rendered the jury instructions confusing, not wrong on their face.[2]  On the one

---

[2]    We therefore reject the People's concession that the instruction was legally incorrect on the ground that the trial court should not have given the CALCRIM 403 instruction in the

6

hand, the highlighted language seemed to indicate that a finding that defendant was guilty of fighting or challenging someone to fight—a prerequisite only to the natural and probable consequences theory—was something the jury must decide before rendering its verdict for attempted murder on *any* theory.  On the other hand, the highlighted language was part of the jury instruction clearly labeled as defining the "natural and probable consequences" theory, which was separate from the instruction defining the direct "aiding and abetting" theory.  Where, as here, the jury instructions "as a whole" are ambiguous, we ask "whether there is a "'reasonable likelihood that the jury has applied the challenged instruction'"" in the way the defendant asserts.  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 182.)  We conclude that there is no reasonable likelihood that the jury read the highlighted phrase from the natural and probable consequences theory instruction to entirely negate the direct aiding and abetting theory instruction.  The jury was given one instruction for each theory, and those theories were clearly labeled as distinct.  What is more, both the prosecutor and the defense attorney repeatedly argued to the jury there were "two" "alternative their[ies]" at issue in the case.  (Accord, *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 300 [argument of counsel may be considered in evaluating whether there was a reasonable likelihood of being misled].)

The verdict form's use of words not in the jury instructions is also of no moment because the "'form of the verdict generally is

first place.  The CALCRIM 403 instruction the court gave is appropriate for cases, such as this one, where the so-called "target" crime (here, fighting or challenging to fight) is not separately charged.  (CALCRIM No. 403, Notes.)

immaterial, so long as the intention of the jury to convict clearly may be seen.' [Citations.]" (*People v. Jackson* (2014) 58 Cal.4th 724, 750.) Here, the jury's verdict reflected a finding of guilt on the crime of attempted premeditated murder as well as on the enhancements, findings that the jury reaffirmed when being polled.

We also reject the second step of defendant's argument, and examine each of his proffered arguments separately.

### A. *Chiu-based argument*

In *Chiu, supra*, 59 Cal.4th 155, our Supreme Court held that a defendant cannot be convicted of first degree, premeditated murder under a natural and probable consequences theory of liability because, in the court's view, "the legitimate public policy considerations of deterrence and culpability would" be better served by holding such aiders and abettors liable for, at most, second degree murder. (*Id.* at p. 166; *People v. Hardy* (2018) 5 Cal.5th 56, 92-93 (*Hardy*).) Defendant urges that this same logic should apply to the crime of attempted premeditated murder, such that his liability as an aider and abettor under a natural and probable consequences theory should be capped at attempted murder, not attempted *premeditated* murder. (Accord, *People v. Mejia* (2019) 40 Cal.App.5th 42, 49-50 [so holding].)

Defendant's argument is inconsistent with our Supreme Court's decision in *People v. Favor* (2012) 54 Cal.4th 868 (*Favor*). *Favor* held that a defendant may be convicted of attempted premeditated murder based on a jury finding that attempted murder was a natural and probable consequence of the underlying crime he aided and abetted as long as the jury separately finds that the attempted murder was premeditated. (*Id.* at pp. 879-880.) More to the point, *Favor* remains good law

8

because *Chiu* dealt with a different issue—namely, the public policy considerations underlying the crime of *murder*. (Accord, *People v. Flores* (2016) 2 Cal.App.5th 855, 869 [so holding].) *Chiu* did not speak to the considerations underlying the crime of *attempted murder* and, to the contrary, went out of its way to distinguish and preserve *Favor*. (*Chiu, supra*, 59 Cal.4th at p. 163.) Until our Supreme Court overrules *Chiu*, we are bound to follow it. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455-456.)

### B.   *S.B. 1437-based argument*

S.B. 1437 amended the statutes defining murder to prohibit a murder conviction based solely upon a natural and probable consequences theory of liability. (§§ 188, subd. (a)(3), 189, subd. (e).) Defendant urges that S.B. 1437's prohibition should apply to the crime of *attempted* murder as well, and further contends that refusing to do so violates the equal protection of the law. In *People v. Love* (2020) 55 Cal.App.5th 273, review granted Dec. 16, 2020, S265445 (*Love*), we rejected both of the arguments defendant now proffers. (*Id.* at pp. 279, 287-289.) Defendant lays out the manifold ways in which he thinks *Love* is wrongly decided. We are not persuaded. Defendant also argues that he is making a novel and more as-applied equal protection argument not addressed in *Love*—namely, that (1) the jury was not instructed on any lesser included offenses, (2) the jury was therefore presented with a choice between convicting him of attempted murder and acquitting him, and (3) this all-or-nothing choice warrants application of strict scrutiny under equal protection (rather than rational basis scrutiny). We are also not persuaded by this argument, as our Supreme Court has drawn no

such distinction. (*People v. Wilkinson* (2004) 33 Cal.4th 821, 837-838.)

## II. Instructional Error

To convict a defendant of a crime under a natural and probable consequences theory, the People must prove (1) the defendant either (a) aided and abetted a second person in committing a predicate offense, or (b) with a second person's aid himself perpetrated the predicate offense, (2) the second person committed the charged crime, and (3) the charged crime "was a natural and probable consequence of the [predicate offense]." (*People v. Prettyman* (1996) 14 Cal.4th 248, 261-262 (*Prettyman*), superseded by statute as stated in *People v. Lopez* (2019) 38 Cal.App.5th 1087, 1103, review granted Nov. 13, 2019, S258175 (*Lopez*); *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1367, 1375 (*Olguin*).) Defendant argues that the pattern CALCRIM instruction on the natural and probable consequences theory given in this case is incorrect because (1) it did not require the jury to find that the crime that must be the natural and probable consequence of the predicate offense of "fighting or challenging someone to fight" was attempted *premeditated* murder (as it only required attempted murder to be the consequence), and (2) it did not require the jury to find that defendant had intended for Cuevas to aid and abet him in the fight or challenge to fight that defendant actually perpetrated as the predicate offense. As noted above, we independently review claims of instructional error. (*Mitchell*, *supra*, 7 Cal.5th at p. 579.)

### A. *Attempted murder versus attempted premeditated murder*

As noted above, our Supreme Court in *Favor*, *supra*, 54 Cal.4th 868 held that a defendant may be convicted of attempted premeditated murder as long as the jury finds that (1) attempted

10

murder is a natural and probable consequence of the predicate offense, and (2) the perpetrator of the attempted murder acted with premeditation. (*Id*. at pp. 879-880.) *Favor* rejected the position—advanced by defendant now—that the jury must find that attempted *premeditated* murder is a natural and probable consequence of the predicate offense. (*Ibid*.) Defendant urges that *Favor*'s rule has been superseded by *Chiu* and by the United States Supreme Court's decision in *Alleyne v. United States* (2013) 570 U.S. 99 (*Alleyne*). We have previously explained why *Chiu* did not disturb *Favor*.

Neither did *Alleyne*. *Alleyne* held that a jury must find, beyond a reasonable doubt, any facts that increase a sentence whether those facts define the elements or penalties for that crime. (*Alleyne*, *supra*, 570 U.S. at pp. 111-112.) To be sure, the finding that an attempted murder is premeditated triggers a higher sentence for the crime of attempted murder. (§ 664, subd. (a); *People v. Banks* (2014) 59 Cal.4th 1113, 1152 ["The willful, deliberate, and premeditated nature of an attempted murder is "'the functional equivalent of an element'" of the offense insofar as it increases the punishment for an attempted murder"], overruled in part on other grounds as stated in *People v. Scott* (2015) 61 Cal.4th 363, 391; *People v. Seel* (2004) 34 Cal.4th 535, 548.) But the fact that the jury must find that the attempted murder in this case was premeditated—which the jury in this case did—does not speak to whether the jury must also find that a natural and probable consequence of the predicate offense is attempted premeditated murder rather than attempted murder. *Favor* found no need for this additional finding, and *Favor* was handed down 12 years *after* the principle that animates *Alleyne* was first recognized in *Apprendi v. New Jersey* (2000) 530 U.S.

11

466.  Admittedly, the Courts of Appeal have split over whether *Alleyne* undermines *Favor* (compare *People v. Gallardo* (2017) 18 Cal.App.5th 51, 82-85 [*Favor* remains good law] with *People v. Dennis* (2020) 47 Cal.App.5th 838, 852 [*Alleyne* undermines *Favor*]), and our Supreme Court has granted review to consider the issue in *Lopez, supra,* 38 Cal.App.5th 1087, review granted Nov. 13, 2019, S258175.  In the meantime, however, *Favor* remains good law.

### B.  *"Reciprocity of intent"*

Although, in the typical case, a defendant convicted of a charged crime under a natural and probable consequences theory aids and abets a second person in committing a predicate offense and the second person thereafter commits the charged crime (e.g., *Prettyman, supra,* 14 Cal.4th at pp. 261-262), a defendant can also be convicted under this theory if *he* is the one who actually perpetrates the predicate offense, is aided and abetted in that offense by a second person, and the second person thereafter commits the charged crime (e.g., *Olguin, supra,* 31 Cal.App.4th at pp. 1367, 1375; *People v. Culuko* (2000) 78 Cal.App.4th 307, 329-330 (*Culuko*)).  This case involves the latter scenario because defendant was the person who perpetrated the predicate offense of fighting the victim or challenging the victim to fight; Cuevas aided and abetted him in that fight or challenge; and Cuevas thereafter committed an attempted premeditated murder.

Defendant urges that, in this scenario, the People must prove an additional element—namely, that the defendant agreed to allow the second person to participate in the predicate offense. There must be, in defendant's words, a "reciprocity of intent": The second person must intend to aid and abet the defendant in perpetrating the predicate offense, so the defendant must be

12

shown to reciprocally intend the second person to aid and abet him.  For support, defendant draws upon principles of agency and language found in *People v. Kauffman* (1907) 152 Cal. 331 (*Kauffman*).

This argument is foreclosed by precedent.

The agency principles and language from *Kauffman* delimit the liability of coconspirators by shielding them from the acts of a coconspirator that are the "fresh and independent product of the mind of one of the confederates outside of, or foreign to, the common design."  (*Kauffman*, *supra*, 152 Cal. at p. 334.)  In *People v. Smith* (2014) 60 Cal.4th 603 (*Smith*), however, our Supreme Court held that this limitation on conspirator liability did not apply to the liability of aiders and abettors under a natural and probable consequences theory.  (*Id.* at pp. 615-617.) Unlike coconspirators who merely "agree to commit a crime," aiders and abettors have mutually participated in the predicate offense (*ibid.*); their mutual participation as "principals" in the predicate offense functions as the "'equivalent to manifesting consent to liability'" to all of the crimes that naturally and probably flow from that predicate offense.  (*People v. Luparello* (1986) 187 Cal.App.3d 410, 439; *Olguin*, *supra*, 31 Cal.App.4th at p. 1376; see *People v. Morante* (1999) 20 Cal.4th 403, 433 ["Aiding and abetting does not require participation in an agreement to commit an offense, but merely assistance in committing the offense"].)  There is accordingly no need to have a further showing of consent or agreement.  What protects a defendant from liability for wholly unexpected acts of a coparticipant is *not* a showing that he agreed to let the coparticipant aid him in committing the predicate offense, but instead that wholly unexpected acts are unlikely to be a "natural and probable

13

consequence" of their mutual criminal activity. (*Smith*, at p. 617.) Defendant urges that no case has specifically rejected his theory, but this ignores that *Smith* and other cases all rest on a principle that, as explained above, is irreconcilable with defendant's theory and could not stand if that theory were the law. (Accord, *Smith*, at pp. 609-617 [defendant who started gang fight liable for shooting by gang rivals, without a showing that defendant consented to the rivals' participation in the gang fight]; *Olguin*, at pp. 1375-1376 [defendant who started fight liable for shooting by coparticipant, without a showing that defendant consented to coparticipant's assistance with the fight]; *Culuko*, *supra*, 78 Cal.App.4th at pp. 329-330 [defendant who abused victim liable for murder by second person, without a showing that defendant consented to that person's assistance with the abuse].)

## III.  Sufficiency of the Evidence

As noted above, defendant's conviction for attempted premeditated murder rests on one of two theories:  (1) defendant aided and abetted Cuevas in the crime of attempted murder, or (2) defendant committed the crime of fighting or attempting to fight with Cuevas's aid, Cuevas committed the crime of attempted premeditated murder, and attempted murder is a natural and probable consequence of the crime of fighting or attempting to fight on the facts of this case.  Because, as we have held, both theories are valid, the jury need not unanimously agree on the theory of liability underlying the conviction. (*Smith*, *supra*, 60 Cal.4th at p. 618.)  In determining whether there is sufficient evidence under each theory, we ask whether the record, as a whole and viewed in the light most favorable to the verdict, contains ""substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable

14

trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]'" (*People v. Dalton* (2019) 7 Cal.5th 166, 243.)

**A.** ***Natural and probable consequences theory***

As set forth above, to prove a defendant guilty of a crime under the theory that the crime was the natural and probable consequence of a predicate offense, the People must establish that (1) the defendant either (a) aided and abetted a second person in committing a predicate offense, or (b) with a second person's aid himself perpetrated the predicate offense, (2) the second person committed the charged crime, and (3) the charged crime "was a natural and probable consequence of the [predicate offense]." (*Prettyman, supra*, 14 Cal.4th at pp. 261-262; *Olguin, supra*, 31 Cal.App.4th at pp. 1367, 1375; *Hardy, supra*, 5 Cal.5th at p. 92.) The charged crime is a natural and probable consequence of the predicate offense if a reasonable person in defendant's circumstances would recognize that the charged crime was a reasonably foreseeable consequence of the predicate offense. (*Chiu, supra*, 59 Cal.4th at p. 165; *People v. Medina* (2009) 46 Cal.4th 913, 920 (*Medina*).) To be a reasonably foreseeable consequence, the charged crime need only be a "'"possible consequence"'"—not a "'"strong[ly] probab[le]"'" one. (*Medina*, at p. 920.)

Substantial evidence supports defendant's conviction of attempted premeditated murder on a natural and probable consequences theory. As seen in the surveillance video, defendant followed the victim, started talking with him and squared off against him as Hooks and Cuevas fanned out beside defendant to cut off the victim's possible routes of escape; this constituted a challenge to a fight, which satisfied the requirement that defendant actually perpetrated the predicate

15

offense of challenging the victim to a fight.[3]  Cuevas committed the charged crime of attempted premeditated murder by shooting at the victim twice as a part of coordinated attack to challenge a person perceived to be a rival gang member.  And the charged crime of attempted murder was a natural and probable consequence of the gang-related turf challenge that defendant initiated with the victim.  The gang expert opined that there is a "high" "probability of violence" that such confrontations will result in a fight or in gunfire.  And it is well within a jury's province to find that a reasonable person would foresee that attempted murder is a natural and probable consequence of a gang-related assault or fistfight.  (E.g., *Medina*, *supra*, 46 Cal.4th at p. 922 [so holding]; *Olguin*, *supra*, 31 Cal.App.4th at p. 1376 [same]; *People v. Godinez* (1992) 2 Cal.App.4th 492, 499-500 [same]; *People v. Montano* (1979) 96 Cal.App.3d 221, 226-227 [same]; see generally *People v. Ayala* (2010) 181 Cal.App.4th 1440, 1449-1450 [collecting cases].)

Defendant argues that there was insufficient evidence that he challenged the victim to a fight because the sole evidence of the challenge was the body language depicted in the surveillance video; defendant's body language did not definitively indicate any challenge or intention to fight; and the victim's failure to fight back shows that the victim had not been challenged to fight.  To be sure, the video did not have an audio track.  But the video itself plainly shows defendant, Hooks, and Cuevas following the victim down the sidewalk; shows defendant walking toward the victim; and shows defendant, Hooks, and Cuevas walking up to

---

[3]  Whether defendant also aided and abetted Hooks or Cuevas in that challenge is irrelevant because, as noted above, it is not necessary.

16

the victim and fanning around him.  It was also undisputed that the encounter took place in 89 Family Swans gang territory; that defendant, Hooks, and Cuevas were 89 Family Swans members; and that defendant believed the victim to be a member of a rival gang.  Although the jury could have viewed defendant's aggressive approach to the victim as an overeager desire to engage in a discourse on the weather or a variety of other topics, the jury also could have viewed the body language of defendants and his cohorts as a challenge to fight prompted by gang rivalry.  We reject defendant's implicit entreaty to reweigh the evidence.  (*People v. Armstrong* (2016) 1 Cal.5th 432, 451.)  The victim's failure to fight back does not show a lack of a challenge so much as it shows a wise choice to try to avoid a confrontation or to escape rather than to engage the three people surrounding him in a fight he might not survive.  And although there is sufficient evidence to support guilt on this theory without the lay opinion of the witness who watched the video repeatedly, that witness's opinions make the evidence of guilt even stronger and were properly before the jury as an appropriate lay opinion of a person who has greater familiarity with the video and who is offering an opinion regarding the gestalt of what the video depicted.  (*People v. Son* (2020) 56 Cal.App.5th 689, 696-698 [witness who watched a video many times may offer lay opinion testimony about the "obscure details in the video" she observed].)[4]

_____

[4]     Defendant contends that the witness's testimony was "speculative" because the witness told the jury about aspects of the video footage that the monitor in the courtroom did not clearly depict due to its larger pixels.  This contention ignores the witness's further explanation that he did, in fact, see the aspects to which he testified on the smaller, higher-resolution screen he

17

**B.** *Direct aiding and abetting theory*

To prove defendant guilty of attempted premeditated murder on a direct aiding and abetting theory, the People have to prove (1) defendant knew of Cuevas's unlawful purpose to commit attempted murder, (2) defendant, by his act or advice, aided, promoted, encouraged or instigated Cuevas's commission of attempted murder, and (3) defendant acted with the intent to commit, encourage or facilitate Cuevas's commission of attempted murder—that is, with the intent to kill. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118; *Prettyman*, *supra*, 14 Cal.4th at p. 259; *People v. Beeman* (1984) 35 Cal.3d 547, 561; *People v. Lee* (2003) 31 Cal.4th 613, 624.) Evidence of a defendant's knowledge and intent (the first and third elements) is "'almost inevitably circumstantial.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055 (*Nguyen*).) Evidence "relevant" to whether a defendant has aided and abetted the perpetrator (the second element) includes "'presence at the scene of the crime, companionship, and conduct before and after the offense.' [Citation.]" (*Id.* at p. 1054.)

Substantial evidence supports the defendant's conviction of attempted premeditated murder under a direct aiding and abetting theory. Defendant's knowledge of Cuevas's purpose to commit murder, defendant's aid in that purpose, and defendant's intent to kill can be inferred from the coordinated manner in which defendant, Hooks, and Cuevas accosted the victim; defendant's role in instigating the confrontation; and defendant's role in directing Cuevas, given that Cuevas pulled out the gun moments after defendant pointed at the victim. Such "concerted action reasonably implies a common purpose." (*People v.*

---

used to study the video, and ignores that the jury was given a laptop with which to view the video on a smaller screen.

*Campbell* (1994) 25 Cal.App.4th 402, 409-410; accord, *People v. Hill* (1998) 17 Cal.4th 800, 851-852 [concerted action implies knowledge and intent]; *People v. McDaniels* (1980) 107 Cal.App.3d 898, 903-904 [same].) Defendant's knowledge and intent are further cemented by defendant's belief that the victim was a rival gang member, the victim's presence in 89 Family Swan territory, and the expert testimony that gang members will confront trespassing rival gang members and that such confrontations typically lead to violence.

Defendant challenges this conclusion with what boil down to four arguments.

First, he argues that the video showed Hooks and Cuevas crossing the street to meet up with defendant before the three of them moved in tandem to follow and accost the victim. Because the video captures the moment when all three 89 Family Swan members met up that day, defendant reasons that their meeting must have been serendipitous "happenstance." Whether they met up mere seconds or long hours before starting their assault on the victim, the coordinated manner in which they stalked and accosted their victim provides substantial evidence to support the jury's finding that they acted in concert and that defendant accordingly knew of and shared Cuevas's intent to kill. The cases defendant cites are inapposite. (*People v. Tabizon* (1958) 166 Cal.App.2d 271, 272-274 [presence in room containing narcotics does not constitute sufficient evidence of dominion or control]; *In re Elisabeth H.* (1971) 20 Cal.App.3d 323, 330-331 [same].)

Second, defendant asserts that there was insufficient evidence to show he was aware Cuevas had a gun, and thus insufficient evidence that defendant knew of Cuevas's plan or that he intended to kill. This assertion lacks merit factually and

19

legally.  Factually, Cuevas drew the gun from his waistband immediately after defendant pointed at the victim; from this coordinated action, the jury could reasonably infer that defendant had signaled to Cuevas—his protégé and cousin—that *then* was the time to pull out the gun.  Defendant had a gun of the same make and model the next day; from this and from the gang expert's testimony that gang members share weapons collectively, the jury could infer that it was the same gun and that defendant had dominion and control over it, both before and after the charged crime.  What is more, the gang expert testified that gang members who are "going out to commit a crime together" "know [which of them] has a gun," and this is a permissible expert opinion about how gangs operate generally that provided the jury a basis to conclude that defendant knew about the gun.  (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 657 (*Killebrew*) [expert testimony regarding the "'culture and habits'" of gangs is permissible]; *Olguin, supra*, 31 Cal.App.4th at p. 1371 [testimony about what "gang members typically expect" is permissible]; *Nguyen, supra*, 61 Cal.4th at p. 1055 [same]; cf. *Killebrew*, at p. 658 [expert may not testify "that a specific individual had specific knowledge"]; *In re Wing Y.* (1977) 67 Cal.App.3d 69, 78-79 [evidence of gang membership alone not relevant to prove criminal conduct]; *Spivey v. Rocha* (9th Cir. 1999) 194 F.3d 971, 978 [evidence of gang membership to prove bias unduly prejudicial when other evidence of bias is admitted].)  Legally, there can be sufficient evidence that a gang member intended to kill a rival gang member even without proof that the member knew one of his cohorts possessed a gun.  (*Medina, supra*, 46 Cal.4th at p. 924; see also *People v. Montes* (1999) 74 Cal.App.4th 1050, 1056.)

Third, defendant contends that the gang expert's testimony regarding a gang's need to police its territory is irrelevant here because the 89 Family Swans gang had allowed a rival gang to operate the marijuana dispensary within but on the border of its territory, such that the 89 Family Swans gang must care less about its territory and such that defendant had no reason to confront the rival gang member. Although the dispensary was run by a different gang, the expert also opined that this was likely a begrudging accommodation because the other gang was more powerful than the 89 Family Swans and opined that it was not unusual for gangs to have irregularly shaped territories in any event. Based on this evidence, the jury could have reasonably inferred that the 89 Family Swans had greater incentive to patrol their territory from further encroachment rather than lesser incentive, as defendant contends.

Lastly, defendant urges that defendant's reaction after Cuevas pulled out the gun does not show defendant had the intent to kill. We disagree. After Cuevas pulled the gun on the victim, defendant did not express shock; instead, he stepped forward to prevent the victim from reaching Cuevas. The fact that defendant was in close proximity to the victim thereafter was not out of a desire to stop Cuevas from shooting, but instead because the victim grabbed defendant and tried to use him as a human shield to keep Cuevas at bay. And the fact that defendant and the others fled after Cuevas's second shot missed could reasonably be viewed by a jury as part of the common plan to evade capture once the confrontation was over. (*Medina, supra*, 46 Cal.4th at p. 924 [evidence that the defendants fled after the shooting was treated as an additional factor suggesting aiding and abetting liability].) Most importantly, the manner in which

defendant, Hooks, and Cuevas worked together before Cuevas drew the gun was sufficient by itself to establish the existence of a common plan to kill the victim as well as defendant's knowledge of the plan and his intent to kill.

## IV.    Correction of Errors in Date of Birth

Defendant contends, and the People concede that defendant's date of birth is incorrectly reported as November 7, 1994 rather than the correct date of November 7, 1997, in the (1) abstract of judgment, (2) probation report, (3) complaint, and (4) information.  Courts have an inherent power, even on appeal, to correct clerical errors in records so as to make these records "reflect the true facts.'" (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)  Because the probation report and abstract of judgment continue to be used by the California Department of Corrections and Rehabilitation for administrative and classification purposes (§§ 1203c, subd. (a)(1), 1203.01; Cal. Rules of Court, rule 4.411), we order those two documents to be corrected.

## DISPOSITION

The trial court is ordered to correct the abstract of judgment and the probation report to reflect that defendant's date of birth is November 7, 1997.  The court is further ordered to forward a certified copy of the corrected abstract of judgment and probation report to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT


We concur:


_____, P. J.
LUI


_____, J.
ASHMANN-GERST